COLUMBIAN NATIONAL TITLE INSURANCE COMPANY, Plaintiff,

v.

TOWNSHIP TITLE SERVICES, INC., d/b/a McGhie Land Title Company, Defendant.

Civ. A. No. 85–4306.

United States District Court, D. Kansas.

May 5, 1987.

Gerald L. Goodell, Goodell, Stratton, Edmonds & Palmer, Topeka, Kan., for plaintiff.

John W. Lungstrum, Stevens, Brand, Lungstrum, Golden & Winter, Lawrence, Kan., for defendant.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

This matter is before the court on plaintiff's motion for summary judgment. This is a diversity action arising out of the alleged breach of a ten-year exclusive agency agreement designating the defendant as the exclusive agent of plaintiff. Pursuant to the agreement, defendant was to solicit and write title insurance policies issued and underwritten by the plaintiff. Plaintiff alleges that defendant breached the agreement by (1) unilaterally terminating the contract before it expired and (2) refusing to indemnify plaintiff for its losses pursuant to the indemnity provisions of the agreement.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When a motion for summary judgment is properly made and supported, the adverse party may not rest upon the mere allegations or denials of his pleading, but his response, through affidavits or documentary evidence, must set forth specific facts showing that there is a genuine issue for trial. Rule 56(e). Thus, the court must enter summary judgment, after adequate time for discovery and upon motion, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* — U.S. —, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In such a case, "no genuine issue as to any material fact" exists, since the complete failure of proof concerning an essential element of the nonmoving party's case necessarily ren-

ders all other facts immaterial. *Id.* 106 S.Ct. at 2553.

Rule 15 c of the Rules of Practice of the United States District Court for the District of Kansas provides in part:

A memorandum in opposition to a motion for summary judgment shall begin with a section that contains a concise statement of material facts as to which the party contends a genuine issue exists. Each fact in dispute shall be numbered, shall refer with particularity to those portions of the record upon which the opposing party relies, and, if applicable, shall state the number of movant's fact that is disputed. All material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party.

Although defendant's memorandum in opposition to plaintiff's motion contains a section entitled "Defendant's Claim of Controverted Facts," this section contains nothing more than a series of questions concerning the factual and legal issues of the case. It clearly fails to contain a concise statement of material facts to which defendant contends a genuine issue exists. The defendant neither makes specific references to the record to support its claimed controverted facts, nor specifically controverts by direct reference any statement contained within plaintiff's statement of uncontroverted facts. Thus, pursuant to Rule 15 c, all facts set forth in plaintiff's statement of uncontroverted facts are deemed admitted by defendant for purposes of this summary judgment motion.

██ In an apparent attempt to compensate for its failure to controvert plaintiff's statement of facts, defendant requests oral argument. Defendant argues that plaintiff's reply "demonstrates that there are a number of misconceptions as to what the facts are in the above-entitled action which counsel for defendant believes can most efficiently be disposed of by oral argument." The court is not persuaded by defendant's arguments. According to Local Rule 15 d, oral argument may be had only

in the court's discretion and on proper showing of the party. The court will not allow defendant to use oral argument to bypass the requirements of Rule 15 c. Defendant's request for oral argument is therefore denied.

The court notes that despite defendant's failure to controvert the facts set forth by plaintiff, defendant has attached an affidavit and several other exhibits. Because plaintiff has failed to controvert any of this evidence, the court will consider defendant's exhibits, in addition to plaintiff's statement of uncontroverted facts, in ruling on plaintiff's motion.

In light of the above, the following material facts are deemed uncontroverted for purposes of this motion:

1. Plaintiff is a corporation organized and existing under the laws of the State of Kansas. Defendant is a corporation organized and existing under the laws of the State of Utah.

2. On or about March 11, 1983, plaintiff and defendant entered into an "Exclusive Agency Agreement."

3. Said agreement provided that defendant would be bound to plaintiff as its agent for a term of ten (10) years and that defendant would not act as an agent for any other title insurer during that period of time. Plaintiff in return agreed not to authorize the issuance of title insurance through any agent other than defendant in Salt Lake County, Utah, and gave defendant a right of first refusal to act as plaintiff's exclusive agent in all other counties in Utah, except Utah County.

4. By the terms of the agreement, defendant was to receive and process applications for title insurance for plaintiff and collect premiums due thereon.

5. Paragraph IIIC5 of said agreement provided that defendant, during the term of the agreement, would:

Indemnify the Principal [plaintiff] for an (sic) on account of any and all loss or loss expense which the Principal may sustain or suffer as provided in this Agreement;

6. Paragraph IIIE of the agreement provided in part:

The Principal [plaintiff] shall have the sole right to adjust, settle or compromise claims. The Agent [defendant] shall be liable to the Principal for any and all loss and loss expenses which the Principal may sustain or incur under any policy or commitment issued pursuant to this Agreement occasioned by, or resulting from *fraud, negligence or misconduct* of the Agent, its employees or officers of the Agent, in the performance of its undertaking as agent of the Principal.

(Emphasis in original.)

7. Paragraph IV of the agreement provided the exclusive grounds for termination of the agreement as follows:

This Agreement and the exclusive agency provided for herein shall automatically terminate ten (10) years after the effective date of this Agreement or upon the occurrence of any of the following:

A. *The Agent [defendant] and the Principal [plaintiff] shall agree in writing to terminate this Agreement;*

B. The Agent shall, for any reason, lose its Utah Insurance License;

C. The Agent shall commit any act of fraud against the Principal or any employee, officer, director or customer of the Principal;

D. The Agent shall commit any act of gross negligence or egregious misconduct in the performance of its duties under this Agreement which in the reasonable judgment of the Board of Directors of the Principal represents a serious threat to the reputation or financial security of the Principal.

(Emphasis added.)

8. In a letter dated March 12, 1985, defendant informed plaintiff it had decided that "from a strictly business and economic viewpoint, it is necessary to terminate the Exclusive Agency Agreement." Defendant advised plaintiff that there were two major reasons for the decision: (1) lenders were not accepting plaintiff's underwriting and defendant could not afford the loss of business revenue; and (2) plaintiff had settled claims on behalf of defendant without consulting defendant.

9. Plaintiff responded to defendant's letter in a letter dated March 14, 1985. Plaintiff pointed out that eight years remained on the agreement and that a unilateral decision by defendant to terminate could not be accomplished under the termination section of the agreement.

10. Plaintiff informed defendant by way of letter dated April 8, 1985, that if plaintiff consented to terminate the agreement, it believed it was entitled to $400,000 for lost remittances.

11. Defendant responded to plaintiff's letter in a letter dated April 19, 1985, in which defendant again advised plaintiff that its decision to terminate was strictly "a business decision." Defendant informed plaintiff that plaintiff's proposed settlement was "totally unrealistic" for several reasons. Defendant outlined its own proposal for plaintiff's consideration.

12. Plaintiff responded to defendant's proposal in a letter dated April 23, 1985. Noting the divergence of opinion on settlement, plaintiff advised defendant that it would be in their best interests to continue under the terms of the agency agreement.

13. By letter dated May 6, 1985, defendant informed plaintiff that it was unilaterally terminating the agreement with plaintiff "for cause" as of May 10, 1985. Defendant's reasons for the termination, as set forth in the May 6 letter, were:

a. Lenders in the Salt Lake County market place were becoming more selective about the insurance underwriters they would approve because of the recent failure of two insurance title companies;

b. Defendant was losing business since some customers would use title companies other than plaintiff, which were approved by their lender.

c. The agreement was oppressive and unworkable based upon the provisions of paragraph IIIE of the agreement.

14. When asked to describe why it felt its termination of the agreement was "for cause," defendant stated:

It is defendant's position that the provisions of paragraph 6E [actually IIIE] of the Exclusive Agency Agreement are grounds for termination in that said paragraph, and specifically the following:

"The Principal shall have the sole right to adjust, settle or compromise claims. The Agent shall be liable to the Principal for any and all loss and loss expenses which the Principal may sustain or incur under any policy or commitment issued pursuant to this Agreement occasioned by, or resulting from *fraud, negligence* or *misconduct* of the Agent, its employees or officers of the Agent, in the performance of its undertaking as agent of the Principal, including but not limited to: ...."

that it is grounds for termination of the Exclusive Agency Contract. In addition to said ground, defendant discovered after the execution of the Exclusive Agency Agreement that the business climate in Salt Lake City and environs changed and it developed that the title insurance business of a most profitable nature that was available to defendant was from customers who were concerned about the stability, liquidity and general substantial resources of the insurance company to meet claims should a title defect occur. Potential title insurance customers discussed that matter on numerous occasions with agents of defendants and it became more clear with the passage of time and from the experiences defendant was having that defendant could not survive if the principal for whom they wrote title insurance in the Sale Lake area was plaintiff. This change of circumstances from the execution of the Exclusive Agency Agreement to the time of its termination defendant believes is grounds for termination."

Defendant's Response to Plaintiff's Interrogatories.

15. According to the affidavit of defendant's president, in 1983 and 1984, lenders in Salt Lake County began carefully scrutinizing plaintiff's title insurance policies and defendant was unable to place plaintiff's policies on many of its commercial and substantial lenders' policies. These lenders informed defendant that plaintiff did not have adequate capital and resources to insure against losses under major commitments. Consequently, defendant terminated the agreement and acquired a more substantial policy underwriter. Since acquiring a new underwriter, defendant has been able to supply its clients with acceptable policies. In the president's opinion, defendant would have been forced out of business if it had not terminated the agreement.

16. Plaintiff has never consented in writing to defendant's termination of the agreement as required by paragraph IVA of the agreement.

17. Pursuant to paragraph VI of the agreement, the interpretation of the terms of the contract is to be governed by Kansas law.

We must now decide, based on these facts, whether plaintiff is entitled to judgment as a matter of law. Clearly, there is no question that defendant terminated the agency agreement in breach of the agreement. Defendant, however, contends that its breach was excused because: (1) commercial frustration and impracticability exists; (2) the contract is oppressive and unconscionable; and (3) plaintiff refused to negotiate in good faith the terms of a termination agreement.

I. *Commercial Frustration and Impracticability.*

■ Defendant argues that its performance under the agency agreement should be discharged because of supervening commercial frustration and impracticability. Before addressing the merits of these defenses, we must address two preliminary issues. First, we must decide whether the Uniform Commercial Code [hereinafter the UCC] is applicable to the facts of this case. Defendant's brief relies heavily on provisions of Article 2 of the UCC, K.S.A. 84–2–101 *et seq.* The court finds, however, that the UCC is not applicable here, since Article 2 applies only to "transactions in goods." K.S.A. 84–2–102. Contracts solely for the rendition of services or for the

rendition of services incidentally involved with the production or sale of goods are not within the scope of Article 2. *Care Display, Inc. v. Didde-Glaser, Inc.*, 225 Kan. 232, 239, 589 P.2d 599, 605–06 (1979). The court finds the agency agreement in the instant case to be a contract for the rendition of services by both parties, and accordingly finds Article 2 inapplicable.

■ Second, the court notes that defendant's arguments fail to distinguish between the doctrines of impracticability and frustration. Although some of the Kansas cases treat the two doctrines as if they are one, it is clear that they are based upon different assumptions and are comprised of different elements. *Compare Restatement (Second) of Contracts* § 261 and § 265. *See also* E. Farnsworth, *Contracts* §§ 9.6, 9.7 at 677–696. The court, in the interest of fairness and clarity, will separately address each defense and how it applies to the facts of this case. We note, however, that for either doctrine, the determination of whether the doctrine works to excuse the defendant's breach is one of law rather than fact and for the court rather than the jury's determination. *Restatement (Second) of Contracts* Ch. 11, Introductory Note at 310; Farnsworth, *supra*, § 9.7 at 691. *See also Sunflower Electric Cooperative, Inc. v. Tomlinson Oil Co.*, 7 Kan.App.2d 131, 138, 638 P.2d 963, 969 (1981).

A. *Impracticability.*

■ The general rule concerning discharge by supervening impracticability is stated in the *Restatement (Second) of Contracts* § 261 (1981):

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

Under this rule, performance will not be discharged if (1) the promisor caused the impracticability; (2) the promisor had rea-son to foresee the impracticability; or (3) the language or circumstances indicate that that the promisor assumed the risk. *Sunflower Electric Cooperative, Inc. v. Tomlinson Oil Co.*, 7 Kan.App.2d 131, 138, 638 P.2d 963, 969 (1981).

■ A distinction is drawn between impracticability that is "subjective" and "objective." *Id.* at 139, 638 P.2d at 970. This has been described as the difference, respectively, between "I cannot do it" and "the thing cannot be done." *Freeto v. State Highway Commission*, 161 Kan. 7, 67, 166 P.2d 728, 762 (1946). Only objective impracticability will relieve a party of its contractual obligation. *Sunflower Electric*, 7 Kan.App.2d at 139, 638 P.2d at 970. Consequently, where the promisor agrees to perform an act possible in itself, he will be liable for a breach of the contract even though contingencies not foreseen by him arise that make it difficult or even beyond his power to perform and which might have been provided against in the agreement. *White Lake Shopping Center, Inc. v. Jefferson Standard Life Ins. Co.*, 208 Kan. 121, 124, 490 P.2d 609, 612 (1971).

The court must first decide whether this is a case of subjective or objective impracticability. The supervening event upon which defendant relies to justify termination of the contract is the alleged change in the business and economic climate in the Utah market, which was apparently brought about by the failure of two other title insurance companies. It is defendant's position that objective impracticability exists in this case. Defendant asserts that *no one* can sell plaintiff's policies in Utah, and not that *it alone* cannot sell the policies.

■ At first blush, it appears that defendant has established objective rather than subjective impracticability. However, on closer analysis, it becomes apparent that defendant's argument is fatally flawed. Under the agreement, defendant promised to act exclusively as plaintiff's agent for the purpose of issuing plaintiff's title insurance policies in Utah. The fact that market conditions have changed and rendered

plaintiff's policies unmarketable (i.e. the supervening event) does not prevent defendant's performance under the agreement. Instead, this supervening event has merely made defendant's performance unprofitable for defendant. Thus, we hold that defendant has failed to show that the impracticability of performance in this case was objective. This failure alone is sufficient to defeat relief under the doctrine. *See Sunflower Electric,* 7 Kan.App.2d at 139, 638 P.2d at 970.

 Even if we were to hold to the contrary and conclude that this was a case of objective impracticability, defendant has failed to show sufficient evidence entitling it to the defense on two other grounds. First, defendant has failed to establish that the non-occurrence of the supervening event was a basic assumption on which the contract was made. *See Restatement (Second) of Contracts* § 261. The continued existence of certain market conditions or the financial conditions of the parties is ordinarily not such an assumption. *Id.* § 261 Comment b. Consequently, market shifts or the financial inability of the promisor does not usually result in discharge under the doctrine of impracticability. *Id.*

 Second, as discussed below, defendant has failed to establish that the supervening event was not foreseeable and that defendant did not assume the risk of this event occurring. According to the Kansas Court of Appeals, "the language or circumstances of a contract may indicate that a party has assumed an obligation to perform despite impracticability. Such an assumption of the risk may be implied and foreseeability may be a factor in such a determination." *Sunflower Electric,* 7 Kan.App.2d at 141, 638 P.2d at 972 (emphasis deleted). When the contingency in question is sufficiently foreshadowed at the time of contracting, the contingency may be considered among the business risks that are regarded as part of the negotiated terms of the contract, either con-

sciously or as a matter of reasonable, commercial interpretation from the circumstances. *Id.* A similar argument prevents application of the defense where the promisor, although having no power to prevent the contingency, had superior knowledge of the possibility of its happening. *Id.* at 143, 638 P.2d at 972 (quoting 18 *Williston On Contracts* § 1953 (3d ed. 1978), p. 118.

Here, defendant was a long-time seller of title insurance in the Utah market—it knew the market and its clients well. We find that defendant had superior knowledge as to the possibility that its clients' product desires might change. To protect itself from this foreseeable possibility, defendant could have inserted appropriate protective language in the agreement.[1] We find it particularly reasonable here, where defendant promised to act *exclusively* as Columbian's agent for *ten years,* that defendant assumed the risk that plaintiff's policies might become unmarketable over that ten-year time period. We therefore hold that defendant assumed the risk that the supervening events would make its performance under the agency agreement impracticable.

In light of the above, the court concludes that defendant has failed to present sufficient evidence to withstand plaintiff's motion for summary judgment on defendant's defense of impracticability. We will next consider the closely related defense of frustration.

### B. *Commercial Frustration.*

The general rule as to discharge by supervening frustration is stated in the *Restatement (Second) of Contracts* § 265 (1981):

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are dis-

---

1. Paragraph IV of the agreement expressly provides for termination of the contract upon the happening of four different contingencies. Defendant could have easily protected itself by insisting that a fifth clause be added providing for termination if the plaintiff's policies ever became unmarketable.

charged, unless the language or the circumstances indicate the contrary.

The doctrine of commercial frustration applies to excuse a breach of contract only "where the object or purpose of a contract is frustrated or its enjoyment prevented by law." *Berline v. Waldschmidt*, 159 Kan. 585, 588, 156 P.2d 865, 867–68 (1945). The doctrine is predicated upon the premise that the breaching party could not reasonably protect itself against contingencies that later arose. *Id.* at 588–89, 156 P.2d at 868. Consequently, the doctrine never applies "where the risk of the event that has supervened to cause the alleged frustration was reasonably foreseeable, and could and should have been anticipated by the parties and provision made therefor within the four corners of the agreement." *Id.* at 589, 156 P.2d at 867. If the supervening event appears to have been reasonably foreseeable and controllable by the parties, the breaching party may not invoke the defense and the contract is enforceable. *Id.* at 589, 156 P.2d at 868.

The court notes that although the doctrines of frustration and impracticability are similar, frustration is not a form of impracticability of performance. Under the doctrine of frustration, performance remains possible, but is excused because a fortuitous event supervenes to cause a failure of the consideration or a practically total destruction of the expected value of the performance. 17 Am.Jur.2d *Contracts* § 402 at 848. The object so frustrated "must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense." *Restatement (Second) of Contracts* § 265 Comment a.

The court finds that defendant has presented sufficient evidence to establish that the principal purpose of the agreement at issue here was in fact frustrated. The purpose of the agency agreement was for defendant to act exclusively as plaintiff's agent in issuing title insurance policies underwritten by plaintiff. When the insurance policies became unmarketable, defendant was totally deprived of the benefits of the contract. Although the unmarketabili-

ty of the policies did not make performance by either party impracticable, it did make performance *useless*. A basic assumption of the agency agreement was that plaintiff's title insurance policies would be marketable—when they no longer were, the basic purpose of the agreement was totally frustrated.

Notwithstanding our finding of frustration, however, we find the doctrine inapplicable here because, as we discussed above in part A, the risk that plaintiff's policies might become unmarketable was reasonably foreseeable, and should have been anticipated by the defendant with a provision made therefor in the agency agreement. In light of the above, the court concludes that defendant has failed to satisfy its burden in establishing that commercial frustration excused defendant's breach.

## II. *Unconscionability and Oppressiveness.*

Alternatively, defendant argues that the provisions in paragraph IIIE of the agency agreement, which grant plaintiff the sole right to adjust, settle or compromise claims, and hold defendant liable for all losses incurred by the plaintiff, are unconscionable and oppressive. Thus, defendant asserts that the contract is unenforceable. Defendant contends that plaintiff acknowledged that these provisions were oppressive and unconscionable and indicated to defendant that it would not settle claims without the defendant being first consulted. Defendant, however, has failed to present any evidence supporting this contention. Thus, the court must disregard these unsupported facts and determine whether the contract is unconscionable based on the uncontroverted facts of record.

The doctrine of unconscionability is used by the courts to police the abuses and excesses of contracting parties. *Wille v. Southwestern Bell Telephone Co.*, 219 Kan. 755, 759, 549 P.2d 903, 907 (1976). The doctrine "is directed against one-sided, oppressive and unfairly surprising contracts, and not against the consequences

*per se* of uneven bargaining power or even a simple old-fashioned bad bargain." *Id.* at 760, 549 P.2d at 907. Although the Kansas Supreme Court has recognized the difficulty in defining the doctrine of unconscionability, it has identified a number of factors to be considered in determining the applicability of the doctrine to a given set of facts. *See id.* at 758, 549 P.2d at 906. These factors include:

> (1) The use of printed form or boilerplate contracts drawn skillfully by the party in the strongest economic position, which establish industry wide standards offered on a take it or leave it basis to the party in a weaker economic position; (2) a significant cost-price disparity or excessive price; (3) a denial of basic rights and remedies to a buyer of consumer goods; (4) the inclusion of penalty clauses; (5) the circumstances surrounding the execution of the contract, including its commercial setting, its purpose and actual effect; (6) the hiding of clauses which are disadvantageous to one party in a mass of fine print trivia or in places which are inconspicuous to the party signing the contract; (7) phrasing clauses in language that is incomprehensible to a layman or that divert his attention from the problems raised by them or the rights given up through them; (8) an overall imbalance in the obligations and rights imposed by the bargain; (9) exploitation of the underprivileged, unsophisticated, uneducated and illiterate; and (10) inequality of bargaining or economic power.

*Id.* at 758–759, 549 P.2d at 906–07 (citations omitted). Mere disparity of bargaining strength, without more, is not enough to establish a case of unconscionability. *Id.* at 759, 549 P.2d at 907. Additional factors such as deceptive bargaining conduct as well as unequal bargaining power must exist. *Id.*

Defendant has failed to present any evidence showing the presence of any one of these factors. Since defendant has failed to make a showing sufficient to establish the elements essential to the unconscionability defense, on which it would bear the burden of proof at trial, the court finds that plaintiff is entitled to summary judgment with respect to the defense of unconscionability and oppressiveness. *See Celotex v. Catrett,* — U.S. —, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

### III. *Good Faith Negotiation of a Termination Agreement.*

As a final defense, defendant argues that plaintiff failed to negotiate a termination of the agency contract in good faith. Paragraph IVA of the agency agreement provides as follows:

> This agreement and the exclusive agency provided for herein shall automatically terminate ten (10) years after the effective date of this agreement or upon the occurrence of any of the following:
>
> A. The Agent and the Principal shall agree in writing to terminate this agreement; ....

Defendant argues that this section, read in light of an implied covenant of good faith and fair dealing, placed a duty on plaintiff to negotiate in good faith a termination of the agency agreement. Specifically, defendant contends that plaintiff acted unfairly and in bad faith by rejecting defendant's "reasonable" settlement offer and making an "excessive" and "unreasonable" counteroffer that defendant pay $400,-000.00 to terminate the agreement.

The court is not persuaded by defendant's arguments. The court believes that paragraph IVA of the agreement alone creates no duty on plaintiff to negotiate a termination of the contract merely because defendant wishes to terminate the agreement. Without a doubt, paragraph IVA was intended merely to allow termination of the contract prior to its ten-year term upon agreement of all the parties. A contrary interpretation of the paragraph would destroy the purpose of the agreement and reduce its terms to absurdity. Such an unreasonable interpretation of a contract is strongly disfavored by the law. *See Garvey Center, Inc. v. Food Specialties, Inc.,* 214 Kan. 224, 227, 519 P.2d 646, 649 (1974).

In a similar vein, the court rejects defendant's argument that plaintiff was under a duty implied in the law to negotiate a termination agreement in good faith. Of course, it is well settled that every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement. *See, e.g., Restatement (Second) of Contracts* § 205 at 99; 17 Am. Jur.2d *Contracts* § 256 at 653. *See also Meier's Trucking Co. v. United Const. Co.,* 237 Kan. 692, 704 P.2d 2, 7 (1985) (Holmes, J., dissenting). There is an implied undertaking on the part of each party to the contract that he will not intentionally do anything that will destroy or injure the other party's rights to receive the benefits of the contract. 17 Am.Jur.2d *Contracts* § 256 at 654. Implied covenants, however, are generally not favored by the law and will always be construed narrowly. 17A C.J.S. *Contracts* § 328 at 287. Courts are careful not to imply a term, where the subject thereof is expressly covered by the contract, or as to which the contract is intentionally silent, or which is against the overall intention of the parties as garnered from the entire instrument. *Id.* § 328 at 288–89.

Defendant has failed to come forward with any case law wherein the courts have found a breach of the implied covenant of good faith and fair dealing based on a party's failure to settle a contract dispute or negotiate a termination of a contract. Given the fact that implied covenants are generally disfavored by the courts, we believe that the Kansas Supreme Court would be reluctant to imply a duty to negotiate a termination agreement in good faith, especially here, where the contract specifically allows termination by mere written agreement of the parties.

Even if we were to hold otherwise, we do not believe that the plaintiff's conduct in rejecting defendant's proposed settlement offer and making a counteroffer of $400,-000 to be in bad faith or unfair. The court therefore holds that defendant's breach of the agency agreement is not excused by the plaintiff's claimed failure to negotiate a termination agreement in good faith.

In light of the above, the court concludes that defendant has failed to satisfy its burden of establishing sufficient evidence to withstand plaintiff's motion for summary judgment. Accordingly, the court holds that defendant is liable to plaintiff for breach of the Exclusive Agency Agreement. Because plaintiff's motion for summary judgment does not address the issue of damages, the court will grant plaintiff's motion only with respect to liability, with the issue of damages reserved for trial. The court notes that this case has been set for trial on May 11, 1987, in Topeka, Kansas.

IT IS THEREFORE ORDERED that plaintiff's motion for summary judgment is granted with respect to the issue of liability.