No. 74,226

T.S.I. HOLDINGS, INC., *Plaintiff/Appellee/Cross-Appellant*, v. LAWRENCE S. JENKINS and ROGER W. HOOD, M.D., *Defendants/Counterclaim Plaintiffs/Appellants/Cross-Appellees*, v. T.S.I. HOLDINGS, INC., AMERITANK, INC., GARSITE/TSR, INC., T.S.I. REFUELERS, INC., HEWITT HOSE, INC. USA, NATIONAL REFUELER LEASING CORP., NEW PROGRESS INC., TRI-STATE TANK CORPORATION, TRI-STATE TANK WEST, INC., MELVYN PAUL, MARCIA PAUL, PHILLIP HODES and BARBARA HODES, *Counterclaim Defendants/Appellees*, v. CITICORP VENTURE CAPITAL, LIMITED, and CITIBANK, N.A., *Additional Counterclaim Defendants/Appellees*.

(924 P.2d 1239)

Opinion filed September 20, 1996.

*Lawrence M. Berkowitz*, of Stinson, Mag & Fizzell, P.C., Kansas City, Missouri, argued the cause, and *Heather S. Woodson*, of the same firm, of Overland Park, was with him on the briefs for appellants/cross-appellees.

*Leonard B. Rose*, of Rose, Brouillette & Shapiro, P.C., of Kansas City, Missouri, argued the cause, and *Michael D. Strong*, of the same firm, was with him on the brief for appellee/cross appellant T.S.I. Holdings, Inc., and counterclaim defendants/appellees T.S.I. Holdings, Inc., Ameritank, Inc., Garsite/TSR, Inc., T.S.I. Refuelers, Inc., Hewitt Hose, Inc. USA, National Refueler Leasing Corp., New Progress, Inc., Tri-State Tank Corporation, Tri-State Tank West, Inc., Melvyn Paul, Marcia Paul, Phillip Hodes, and Barbara Hodes.

*Kevin F. Kostyn*, of Whitman Breed Abbott & Morgan, of New York, New York, argued the case, and *Edward R. Spalty* and *John A. Vering III*, of Armstrong, Teasdale, Schlafly & Davis, of Kansas City, Missouri, were with him on the brief for counterclaim defendants/appellees Citicorp Venture Capital, Limited, and Citibank, N.A.

The opinion of the court was delivered by

SIX, J.: This is a contract case, rich in issues, arising from an attempt to sell stock in a closely held corporation. The appeal involves a written agreement (Agreement) in which T.S.I. Holdings, Inc. (TSI), a holding company, its subsidiaries and shareholders, as sellers, agreed to sell a controlling portion of TSI voting common stock to Lawrence S. Jenkins and Roger W. Hood, M.D., as buyers. The March 22, 1993, closing date passed, and the sale never closed.

The primary question is whether sellers, in defending against buyers' breach of contract claim, may rely on their performance being excused as impossible, impracticable, and commercially frustrated. Additional questions are: (1) When did the Agreement terminate; (2) was time of the essence; (3) is the clean hands doctrine applicable; (4) is there a jury issue as to whether sellers breached the Agreement by failing to use best efforts and violating a nondisclosure provision; (5) are the claims of fraudulent misrepresentation and fraud by silence valid; (6) does the claim of tortious interference survive summary judgment; and (7) was the award of costs and attorney fees proper under the Agreement?

## The Litigation

A brief litigation prologue will be helpful in linking the issues with their resolution. TSI began this suit against buyers by seeking a declaratory judgment that, among other things, the Agreement had expired by its terms on March 22, 1993. TSI also alleged that buyers tortiously interfered with a business expectancy by chilling negotiations between TSI and Citicorp Venture Capital, Limited (CVC). Buyers filed a counterclaim against TSI and added the other sellers as additional counterdefendants. The counterclaim sought specific performance and a declaration that the Agreement was still in effect.

Buyers amended their counterclaim to assert, among other things, a claim for breach of contract against sellers and added a claim for tortious interference against CVC and Citibank, N.A. (Citibank). In their amended counterclaim, buyers abandoned their allegation that the Agreement was still in effect and could be specifically performed. TSI later amended its petition to add fraudulent misrepresentation and fraud by silence claims against buyers. TSI withdrew its claims against buyers for tortious interference.

The district court granted CVC and Citibank's motion to sever. The respective claims of TSI and buyers went to trial. At the close of TSI's case, the district court ruled as a matter of law on TSI's declaratory judgment claim that: (1) the closing date of the Agreement could only be extended by mutual consent, (2) there was no mutual consent to extend the closing beyond March 22, 1993, and

(3) the Agreement expired by its own terms on March 22, 1993. The district court also granted buyers' motion for a directed verdict against TSI's fraudulent misrepresentation and fraud by silence claims. After the fifth day of trial, the district court granted sellers' motion for a directed verdict against buyers' counterclaim for breach of contract on the basis of impossibility or impracticability of performance and commercial frustration.

Later, the district court granted CVC and Citibank's motion for summary judgment on buyers' tortious interference claim, based on its prior holding that the Agreement could not be performed. However, the district court suggested that were it not for the application of the doctrines of impracticability and commercial frustration, buyers would have been entitled to a trial on their tortious interference claims against CVC and Citibank.

The district court denied buyers' motion for a new trial and granted TSI's motion for attorney fees and costs.

## ISSUES

The issues in buyers' appeal are whether the district court erred in ruling that: (1) sellers' performance was excused under the doctrines of impossibility, impracticability, or commercial frustration, (2) the Agreement expired on March 22, 1993, (3) CVC and Citibank are entitled to summary judgment, and (4) TSI is entitled to attorney fees and costs.

The issues in the TSI cross-appeal are whether the district court erred in entering a directed verdict against TSI on its claims against buyers for: (1) fraudulent misrepresentation and (2) fraud through silence.

Jurisdiction is based on our transfer of the case from the Court of Appeals. K.S.A. 20-3018(c).

We affirm the declaratory judgment in favor of TSI. The Agreement expired on March 22, 1993. We reverse and remand on the other three issues in buyers' appeal. The facts when reviewed under the language of the Agreement do not establish impracticability of performance or commercial frustration. We affirm on the two issues in TSI's cross-appeal.

## FACTS

TSI is a Kansas City, Kansas, company principally involved in the manufacture and installation of tanks on trucks used for delivery of diesel fuel, liquid propane, and gasoline. Melvyn Paul is the chief executive officer of TSI and the owner of 75% of its issued and outstanding stock. Phillip Hodes owned the remaining 25% of TSI's stock. TSI is considered to be in a small, or "niche," industry in which it enjoys a dominant position.

Buyers are local investors who contracted under the Agreement with sellers (TSI and its subsidiaries, Ameritank, Inc.; Garsite/TSR, Inc.; T.S.I. Refuelers, Inc.; Hewitt Hose, Inc. USA; National Refueler Leasing Corp.; New Progress, Inc.; Tri-State Tank Corporation; Tri-State West, Inc.; and shareholders Melvyn Paul, Marcia Paul, Phillip Hodes, and Barbara Hodes) to purchase 51% of the issued and outstanding stock of TSI.

By mid-1992, Paul recognized that without an infusion of cash and new management, TSI would not grow. He began to consider securing an investor for his company. Paul discussed TSI's needs with Fehmi Zeko, Jr., the son of a local long-time family friend. Zeko was then employed with Citibank in New York. TSI needed more capital, was heavily leveraged, and could not borrow additional funds from its bank.

Aware that CVC (a wholly owned subsidiary of Citibank) made such investments, Zeko contacted James Luikart, an employee of CVC, regarding TSI's need for investment capital. In October 1992, Zeko and Luikart met with Paul in Kansas City and toured the TSI facilities for a few hours. However, no decisions were made.

Paul first met with buyers in August 1992, regarding a possible sale to them of a controlling interest in TSI. On November 20, 1992, Paul and Hodes entered into a letter of intent with buyers to sell 51% of the outstanding common stock of TSI. The agreed closing date was not to be later than December 31, 1992, unless mutually extended by the parties. The parties discussed that Hood would provide the money for the investment in TSI and Jenkins would provide the management skills that Paul needed to manage

and expand TSI. Paul revealed to buyers in the August 1992 meeting that his TSI common stock was pledged at the College Boulevard National Bank (Bank) as collateral for a $1.6 million personal loan. Paul owned stock in the Bank and had served on its board of directors.

The letter of intent anticipated that the Bank would release its lien on Paul's TSI common stock. TSI then could cancel the common stock and issue new preferred stock to Paul and Hodes and issue new common stock to Jenkins and Hood. Accordingly, Paul asked Jon Grams, president of the Bank, to sign a letter dated January 14, 1993 from Paul's counsel. The January 14 letter explained that Paul was negotiating a transaction that would "convert a certain portion of his existing common stock into preferred stock in the face amount of $2,500,000.00 and subject the remainder of his common stock to a purchase option." The letter further requested that the Bank "release the TSI Holdings, Inc. common stock which you currently hold as collateral and allow it to be replaced by the $2,500,000.00 in preferred stock." On January 29, 1993, Grams approved and accepted the proposal by signing the letter.

On February 4, 1993, Jenkins, Hood, Paul, and TSI and its subsidiaries, and other shareholders reached the Agreement providing for buyers to purchase 51% of the common stock of TSI. The closing date was stated as February 26, 1993, or such later date as the parties mutually agreed. The Agreement was the product of extensive negotiations between the parties and their attorneys.

Following the terms of the letter of intent, the Agreement provided that TSI would issue new common stock, 51% of which was to be transferred to buyers in exchange for $2.5 million to be paid to TSI ($1 million in cash at closing and $1.5 million as a promissory note). The remaining 49% of the new common stock was to be held by Paul and Hodes, subject to a purchase option that Jenkins and Hood could exercise.

Regarding the common stock then held by the Bank as collateral for Paul's loan, the Agreement provided:

"[Section 7.1] (o) **Release of Midland** [Midland National Bank, also known as College Boulevard National Bank] **Pledge.** Mel Paul shall have furnished docu-

mentation satisfactory to Buyer evidencing release of the Midland Pledge on terms and conditions as set forth in that certain letter, dated January 14, 1993, from Charles Christian Kirley [Paul's lawyer] to Midland National Bank, a copy of which is included in the Disclosure Schedule."

The letter referred to in 7.1(o) was the letter Grams had signed agreeing in principle to the broad outline of the transaction.

The Agreement further provided at Section 4.1(a) that Paul (and the other sellers) "will use their respective best efforts" to fulfill their obligations, including obtaining any consents or approvals of any third party required by the Agreement. However, the Agreement also provided:

"For purposes of this Section 4.1(a), the use of best efforts *shall not include any expenditure of funds*, except to the extent provided by any express provision of this Agreement or unless Buyers agree to cause reimbursement, by Buyers, TSI, or the Subsidiaries, of any such expenditures." (Emphasis added.)

Shortly after the Agreement was signed, two events occurred involving the Bank. First, Grams concluded that he had been under a misimpression about the nature of the TSI transaction when he signed the January 14, 1993, letter. Grams testified that he did not understand that Paul would be receiving both preferred stock plus some common stock. Grams reversed his position. He decided that the transaction could not be approved unless the Bank received all of the stock that was going to be issued to Paul. Accordingly, Grams would not allow the Bank to sign off on a February 17, 1993, letter from Paul's counsel to the Bank asking for a release of the Bank's lien on Paul's common stock so that new preferred stock could be substituted as collateral.

Regarding the second event, Grams testified that in mid-February 1993, bank regulators began putting "a lot of pressure on all the executives at the bank . . . on a daily basis." By mid-March, the Federal Deposit Insurance Corporation (FDIC) had sent a team of approximately 15 people from its liquidation division to assess the assets of the Bank. By mid-March, Bruce Bonner, vice president of commercial lending at the Bank, concluded that the regulators would close the Bank.

Grams was concerned that he would be second-guessed by the bank regulators if he released Paul's stock in TSI. Grams reasoned

such action could be construed as giving favorable treatment to Paul, who Grams considered was an "insider" by virtue of Paul's position as a shareholder and former Bank director. Grams and Bonner were both concerned about their personal liability if the Bank released Paul's stock without specific approval from the regulators.

In mid-February, Paul's $1.6 million loan from the Bank was renewed for a 6-month term. The loan was on the Bank's "criticized assert report." The Bank lent Paul $312,500 so he could pay the interest on the loan. On February 24, 1993, the executive loan committee for the Bank gave preliminary approval of release of Paul's TSI stock in exchange for the new stock. On March 18, 1993, the Bank's executive loan committee again gave preliminary approval for the release of TSI stock.

Although the Bank discussed a possible release of Paul's stock with the regulators, the regulators did not comment on the proposal. When contacted about releasing Paul's stock, Grams said that "the regulators were crawling all over his back" and that he would not do anything without their approval because "he didn't want his business decision today to be an indictment down the road."

Sometime before March 10, 1993, Bonner expressed concern to Paul about releasing the common stock. Bonner testified that he never told Paul that the Bank would not release the stock and that the Bank never made a decision not to release the stock. Bonner also testified that on March 22, 1993, the day of the scheduled closing, the Bank was still considering its position concerning the stock. The Bank believed that the parties were continuing to complete and document the sale.

As of February 26, 1993, the closing date in the Agreement, much of the documentation required to be provided by the sellers had not yet been completed. The parties signed two written extensions of the closing date. (Section 10.9 of the Agreement required amendments to be in writing.) The first one extended the date from February 26, 1993, to March 15, 1993, and the second extended the date from March 15, 1993, to March 22, 1993.

During February and part of March 1993, Jenkins was at TSI almost on a daily basis. He was put on the payroll, covered by health insurance, and treated as a management employee. He was given office space to learn the business. According to Paul, Jenkins was to be paid a salary for his time if the deal closed. On March 12, 1993, Paul informed Jenkins that he was concerned about the problems the Bank had encountered with federal regulators. He suggested there might be a problem with the procedure set forth in the January 14, 1993, letter. Michael Kahn, buyers' attorney, testified that after March 15, 1993, passed without a closing, he attempted to negotiate an open-ended extension of the closing date. Paul was unwilling to sign such an open-ended extension. Kahn testified that Paul's counsel suggested that the parties create an escrow, under which the buyers would contribute their consideration and the sellers would deposit the stock and other documents until the conditions precedent could be satisfied. The buyers agreed to this arrangement. According to Kahn, after Paul learned of the buyers' agreement, he decided not to proceed with the escrow, and instead the parties agreed to extend the closing again, to March 22, 1993. Paul testified that it was important to him that the deal close quickly because the Agreement restricted his ability to manage TSI and created uncertainties about who owned TSI.

Paul agreed to a proposal set forth in a March 16, 1993, letter to the Bank from buyers' counsel that would have given the Bank a security interest in both Paul's new preferred and common stock. However, Grams was unwilling to release the stock without first receiving the regulators' approval.

Counsel for the parties unsuccessfully attempted in telephone conversations to convince the Bank to release Paul's common stock. Kahn testified that "in order to accomplish the transfer as delineated in the Agreement, it was necessary that [the Bank] allow the release of [Paul's common] stock for the purpose of allowing it to be exchanged."

Grams testified that there was nothing that Paul could have done to get his stock freed up other than paying off the $1.6 million balance on the loan at the Bank. As of March 22, 1993, the Bank had not decided to release Paul's stock. Bonner, in responding to

the sellers' attorney's March inquiry, said that the Bank was "still working on it." Bonner could not give a time when the Bank would make a decision.

On March 22, 1993, buyers' counsel notified sellers' counsel that the buyers were ready to close. By letter dated March 24, 1993, sellers' counsel notified buyers' counsel that there would be no further extensions of the closing date and that the Agreement had lapsed.

On April 2, 1993, federal regulators took over the Bank, and Paul's common stock in TSI came under the control of the FDIC.

### TSI's Contacts With CVC and Citibank

Section 4.1(c) of the Agreement provided that until closing or termination, none of the sellers would

"discuss, negotiate, or deal with any other corporation, firm, or other person, or entertain, solicit, accept, or consider any inquiries, offers, or proposals relating to the sale of any common stock or assets of TSI or any of the Subsidiaries."

In early March 1993, Paul invited Zeko and Luikart to return to Kansas City. Buyers assert that Zeko actually requested the meeting. A meeting between Zeko, Luikart, and Paul was scheduled for March 10, 1993, to discuss TSI. Zeko testified that he set up the meeting and that Luikart wanted him to attend. They were in Kansas City to follow up on the October conversations concerning CVC's interest in making an investment in TSI. A mutual acquaintance related to Hood that Paul had told him Paul was talking to CVC. When Jenkins asked about discussions with CVC, Paul said that representatives of CVC might be in town and might stop by to see him. Paul told Jenkins he thought continued contact with Citibank and CVC would be advantageous. Jenkins inquired if Paul was negotiating to sell TSI to Citibank and CVC. Paul denied sale negotiations. Paul testified that he did not feel it would be "appropriate" for Jenkins to attend the meeting with Luikart and Zeko. Jenkins did not request to attend the meeting. Sometime after March 10, 1993, Jenkins asked Paul about the meeting and, according to Jenkins, Paul told him that there was no meeting because the CVC and Citibank people did not have time to see him

while they were in Kansas City. Paul claims to have told Jenkins about the meeting.

The testimony of what was said at the March 10, 1993, meeting concerning the status of the Agreement was contradictory. Paul testified that he told Luikart and Zeko that he had a contract to sell a percentage of the business to Hood and Jenkins. The general terms of the Agreement were outlined. Paul expressed concerns about his difficulties in closing with Jenkins and Hood. He was unsure that he could complete the transaction. According to Luikart and Zeko, Paul told them the transaction could not close. Paul denied telling Luikart and Zeko that the transaction was no longer viable.

The length of the March 10 meeting was described by Zeko: "[T]hey were there all day." Zeko had discussed with the president of CVC his interest in going to Kansas City and pursuing a new career with TSI. Luikart testified, "Well, we had gone out there, because [Zeko] was possibly interested in joining [TSI], and I think I made it clear to him that we would be—Citicorp Venture Capital would be interested in investing only if someone like himself were to join the company."

Upon returning to New York, Luikart completed an internal memorandum dated March 12, 1993, to present to CVC's investment committee at its weekly meeting on March 15, 1993. Luikart proposed that CVC invest in TSI on essentially the same terms as the Agreement with Jenkins and Hood, subject to performance of due diligence. On March 15, 1993, CVC's investment committee gave preliminary approval to Luikart's recommendation. CVC claims this preliminary approval was not expressed to Paul or any other TSI representative before March 23, 1993. However, telephone records of TSI, Citibank, and CVC show 12 telephone calls between TSI and CVC or Citibank from March 10 through 22, 1993. On March 23 and 24, there were at least nine calls between TSI and CVC or Citibank. Citibank was billed for time spent by its attorneys on the CVC-TSI matter as early as March 23, 1993, before buyers were informed by sellers of the Agreement termination. Paul notified CVC on March 24, 1993, that the TSI/Jenkins and Hood deal was dead.

On March 24, 1993, at 9:20 a.m., David Chaffin, chief financial officer of TSI, faxed to Luikart 5-year forecasts of the TSI companies prepared for CVC's review. The fax was sent minutes after Paul's attorney had faxed a letter to buyers' attorney terminating the Agreement. On March 25, 1993, to reduce the cost of redrafting a new agreement, Paul's attorney forwarded to counsel for CVC, by overnight mail, a copy of the Agreement and a copy of the financial disclosures made by TSI to buyers. Paul told Zeko that the Bank held his TSI common stock and that he could not get it released. Zeko told him that it was "nothing to worry about. We can handle that." On March 29, 1993, Luikart sent Paul a letter confirming that Paul and Luikart had agreed that CVC would invest "up to" $2.5 million in TSI. Luikart expressed delight that CVC was to become Paul's "partner" in TSI. Luikart would not characterize his letter as a commitment.

On or about April 2, 1993, Zeko was advised by a telephone call from counsel for buyers that they still had a binding Agreement to purchase TSI. Zeko later received a letter to that effect.

On April 8, 1993, counsel for CVC advised counsel for buyers that CVC was under the impression that the Agreement had been terminated and asked for an explanation. Counsel reiterated buyers' claim.

By a May 4, 1993, letter, counsel for CVC advised all interested parties that CVC was canceling discussions with TSI because of the ongoing dispute.

## DISCUSSION

### Directed Verdict Against Buyers' Breach of Contract Claims

In ruling on a motion for a directed verdict, the trial court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought. Where reasonable minds could reach different conclusions based on the evidence, the motion must be denied. A similar analysis must be applied by an appellate court when reviewing the grant or denial of a motion for directed verdict. See *Simon v. National Farmers Organization, Inc.*, 250 Kan. 676, Syl. ¶ 4, 829 P.2d 884 (1992).

Buyers argue that the district court erred in determining that sellers' performance under the Agreement was excused as impossible, impracticable, or commercially frustrated. These terms have been used interchangeably in the past. See, *e.g., State Highway Construction Contract Cases*, 161 Kan. 8, 66-67, 166 P.2d 728 (1946). Modern authorities have used the term "impracticability" rather than "impossibility." See, *e.g., Sunflower Electric Coop., Inc. v. Tomlinson Oil Co.*, 7 Kan. App. 131, 138, 638 P.2d 963 (1981), *rev. denied* 231 Kan. 802 (1982). We will use "impracticability of performance" in this opinion, rather than repeating the three terms. (For a discussion of the differences between impracticability [impossibility] of performance and commercial frustration, see *Columbian Nat. Title Ins. v. Township Title Serv.*, 659 F. Supp. 796, 802-04 [D. Kan. 1987].)

Buyers assert that the risk of inability to obtain the pledged TSI stock from the Bank was foreseeable and assumed by sellers under Section 7.1(o) of the Agreement. They contend that Section 7.1(o) contemplated the possibility that the Bank might not release the pledged TSI stock. Under 7.1(o), release of the Bank pledge was made a condition precedent to the buyers' obligations, not the sellers'.

The sellers, Citibank, and CVC respond that the Bank's change of position and failure to release the stock was not foreseeable at the time the Agreement was executed on February 4, 1993. Grams signed the letter indicating the Bank's agreement to release the stock less than a week before. There were no FDIC auditors in the Bank then. After the Agreement was signed, Grams changed his position and insisted that the Bank would need to receive both Paul's reissued preferred and common stock as collateral, instead of only the preferred. Grams also insisted that FDIC officials would have to approve the release of the collateral. Sellers and CVC/Citibank point to Section 4.1(a) of the Agreement, in which sellers agreed to use their best efforts to obtain the release of the collateral, but were not required to expend funds to do so. According to sellers, release of the stock was neither an unconditional promise nor a guarantee. We agree.

In our view, the Agreement covered the possibility that the Bank might not perform. Buyers controlled their risk by negotiating the inclusion of Section 7.1(o). Sellers were afforded similar protection by Section 4.1(a). We need not decide whether the difficulties surrounding the release were foreseeable on February 4, 1993. We hold that the doctrine of impracticability of performance is not applicable under the facts of this case. We now turn to a discussion of the rationale for our conclusion.

## Impracticability of Performance

The district court's finding of impracticability of performance also controlled the ruling on the summary judgment motion in favor of CVC/Citibank on the tortious interference claim of Jenkins and Hood.

Whether a party should be excused from its obligations under a written agreement because of impracticability of performance is a question of law. *Sunflower Electric Coop, Inc.*, 7 Kan. App. 2d 131, Syl. ¶ 1; Restatement (Second) of Contracts, Ch. 11, Introductory Note, p. 310 (1979). Our review of questions of law is unlimited. *Gillespie v. Seymour*, 250 Kan. 123, 129, 823 P.2d 782 (1991). The applicability of the doctrine depends upon the circumstances and conditions of each case. See *Berline v. Waldschmidt*, 159 Kan. 585, 588, 156 P.2d 865 (1945).

*State Highway*, 161 Kan. at 67, recognized the important distinction between subjective ("I cannot do it") and objective ("the thing cannot be done") impracticability.

Only objective impracticability may serve to relieve a party of a contractual obligation. *Sunflower Electric Coop., Inc.*, 7 Kan. App. 2d at 139. The impracticability that may excuse performance must exist: (1) in the nature of the thing to be done, *White Lakes Shopping Center, Inc. v. Jefferson Standard Life Ins. Co.*, 208 Kan. 121, 124, 490 P.2d 609 (1971); and (2) when the "thing to be done" cannot be done by anyone, *State Highway*, 161 Kan. at 67. As to subjective impracticability, the general rule is stated in *White Lakes*, 208 Kan. 121, Syl. ¶ 2:

"When one agrees to perform an act possible in itself he will be liable for a breach thereof although contingencies not foreseen by him arise which make it

difficult, or even beyond his power, to perform and which might have been foreseen and provided against in the contract."

For a review of our early cases, see *Ashland Oil and Refining Co. v. Cities Service Gas Co.*, 462 F.2d 204, 211 (10th Cir. 1972) (impracticability of one mode of performance does not relieve a promisor from an obligation to render alternative performance).

Our past review of the impracticability doctrine has been infrequent. Although we have recognized and discussed the doctrine, we have never applied it. A discussion of the cases arising in Kansas is illustrative of why this case is not the exemplar for our initial application.

The single application of the impracticability doctrine in Kansas occurred in a premises liability wrongful death action. See *Rogers v. Omega Concrete Systems, Inc.*, 20 Kan. App. 2d 1, 883 P.2d 1204 (1994). The application of the impracticability doctrine was not necessary to grant Omega's motion for summary judgment. Omega did not contribute to the proximate cause of the accident. 20 Kan. App. 2d at 9-10.

The doctrine has been discussed but not applied in the following cases:

In *Columbian Nat. Title Ins.*, 659 F. Supp. 796, plaintiff title insurer (Columbian) sued defendant title insurance agency (Township), alleging breach of a 10-year agreement designating Township as the exclusive agent of Columbian for purposes of soliciting title insurance business. Township claimed the defenses of commercial frustration and impracticability. The court determined that the fact Columbian's policies had become unmarketable only made Township's performance unprofitable, so subjective impossibility was all that was shown. The court also noted Township's superior knowledge of the market and the possibility that Columbian's policies might become unmarketable was foreseeable to Township. Township had assumed the risk and could have inserted appropriate protective language in the agreement, but did not. 659 F. Supp. at 803. The court found that Township had presented sufficient evidence to establish commercial frustration, but determined that the doctrine was inapplicable because the risk of unmarketability was foreseeable. 659 F. Supp. at 804.

In *White Lakes*, the shopping center sued defendant insurance company to recover a $77,000 fee paid to the insurance company concerning a $3.85 million loan commitment to provide financing. The shopping center claimed impracticability of performance from its inability to complete construction at a cost within the original loan commitment. We refused to recognize cost increase as an impossibility relieving the shopping center from its contractual obligations. 208 Kan. at 124.

In *State Highway*, a consolidation of 13 cases in which construction firms sought to have contracts canceled on the grounds of impracticability of performance because of the impact of World War II, we said:

"One who voluntarily executed with the State Highway Commission a binding contract which contained no provision excusing performance to construct a highway project, at a time when he knew a continental war was raging in Europe and another in Asia, and when there were many indications that our nation would become a belligerent party in such war, or knowing it had become such a party, and realizing that the performance of the contract might be delayed or become more expensive or burdensome by reason thereof, is not entitled to have his contract canceled because of conditions resulting from the participation of our nation in such wars." 161 Kan. 8, Syl. ¶ 5.

In *Berline*, 159 Kan. at 590-91, the possibility of war and ensuing drilling restrictions were reasonably foreseeable to the parties and could have been covered with a contingency in the contract.

*Sunflower Electric Coop, Inc.*, 7 Kan. App. 2d 131, involved a breach of contract action by Sunflower against Tomlinson, a gas producer, under a natural gas supply contract. Sunflower claimed damages for the difference between the contract price and Sunflower's cost to obtain gas from an alternate source after the breach. The contract provided that Tomlinson would obtain the gas from a specific field. Tomlinson was never able to provide the contracted amount of gas from the field, because the field was exhausted. Tomlinson's research seemed to suggest adequate reserves. Tomlinson claimed impossibility in defense. The district court agreed. The Court of Appeals reversed. The *Sunflower* court reasoned that the impossibility was objective, in that the evidence showed no one could have obtained adequate gas from the field to supply the

contracted amounts. However, the possibility that the field was inadequate was foreseeable to Tomlinson, and Tomlinson assumed the risk that the reserves would be insufficient. 7 Kan. App. 2d at 143.

In *Wichita Properties v. Lanterman*, 6 Kan. App. 2d 656, 633 P.2d 1154 (1981), a tenant of a 5-year commercial lease unsuccessfully relied on impracticability of performance resulting from his inability to obtain a liquor license. The Court of Appeals determined that the possibility of not obtaining a liquor license was a foreseeable contingency that could have been provided for in the lease. 6 Kan. App. 2d at 664.

In this case, the Bank's agreement to release, as shown by Grams' signature on January 29, 1993, was crucial in allowing the sale to go forward. Buyers and sellers attempted to protect themselves under the Agreement in the event the Bank did not release the pledged stock. The buyers' obligation to make the down payment of $1 million was contingent on Paul obtaining release of the pledged stock (Section 7.1[o]).

Section 4.1(a) obligated sellers to use their best efforts to obtain release of the stock from the Bank, as specified under Section 7.1(o). Sellers would have an implied contractual obligation to make a good faith effort to obtain release of the collateral from the Bank, with or without Section 4.1(a). Section 4.1(a) also provided that best efforts would not include expenditure of funds (unless buyers agreed to reimburse for such expenditures). Section 4.1(a) defined the boundaries for the sellers' best efforts. If sellers exercised their best efforts and the pledged stock was not released, then the sale simply would not close. The sellers neither assumed the risk nor guaranteed the Bank's release of Paul's TSI stock. This is not an impracticability of performance case because under Section 4.1(a), sellers were required only to exert their best efforts to secure release of the stock.

## Best Efforts

Buyers argue that the question of whether sellers met their best efforts obligation was for the jury to decide. We agree. The best efforts provision was not only a protection for sellers, but also a

protection for buyers. Section 4.1(a) created a standard of conduct for sellers' performance under the Agreement above and beyond the implied obligation of good faith. See 2 Farnsworth on Contracts § 7.17, p. 314 and § 7.17b, pp. 335-36 (1990), which state:

"Another term that courts often supply is one imposing a duty of 'best' or 'reasonable' efforts. Such a duty requires a party to make such efforts as are reasonable in the light of that party's ability and the means at its disposal and of the other party's justifiable expectations. Although the scope of this duty is no better defined than is the scope of the duty of good faith, it is clear that the duty of best efforts is more onerous than that of good faith."

"Because courts sometimes confuse the standard of best efforts with that of good faith, it will be well at the outset to make plain the distinction between the two standards. Good faith is a standard that has honesty and fairness at its core and that is imposed on every party to a contract. Best efforts is a standard that has diligence as its essence and is imposed on those contracting parties that have undertaken such performance. The two standards are distinct and that of best efforts is the more exacting, though it presumably falls short of the standard required of a fiduciary, one required 'to act primarily for the benefit of another in matters connected with his undertaking.'" (quoting Restatement (Second) of Agency § 13, comment *a* [1957]).

### Unclean Hands

Buyers claim that TSI should be barred from seeking declaratory relief under the equitable doctrine of clean hands. We do not agree.

The clean hands doctrine is based upon a maxim of equity that one who seeks equity must do so with clean hands. It provides in substance that no person can obtain affirmative relief in equity with respect to a transaction in which the person has been guilty of inequitable conduct. *Fuqua v. Hanson*, 222 Kan. 653, Syl. ¶ 3, 567 P.2d 862 (1977). The clean hands maxim is not a binding rule, but is to be applied in the sound discretion of the court. 222 Kan. 653, Syl. ¶ 4.

Section 7.1 of the Agreement lists several conditions that must occur before the buyers are required to perform any of their obligations. Under 7.1(o), Paul was required to furnish documentation to show that the Bank had released the pledged stock. At Section 4.1(a) of the Agreement, the sellers promised to use their best efforts (not including "any expenditure of funds") to fulfill the

conditions described at Section 7.1 before closing. At 4.1(c), sellers promised not to disclose the terms of the Agreement with any others before closing or termination.

Buyers seek damages for the sellers' alleged breaches of Sections 4.1(a) and (c) of the Agreement. If buyers were seeking specific performance, as opposed to damages for breach, the sellers' alleged breaches might be used as grounds for excusing certain conditions of the contract (such as extending the closing date to some "reasonable time" after March 22, 1993). See 2 Farnsworth on Contracts § 8.6, p. 379 (1990) ("An obligor may excuse a condition of its duty by committing a breach that causes the nonoccurrence of the condition. When the condition is excused, the obligor's duty becomes absolute."). However, without any claim for specific performance, it is not necessary to consider whether the March 22, 1993, closing date should be "excused." Neither the doctrine of clean hands nor any breaches by sellers affect interpretation of the Agreement, including determination of the date in the declaratory judgment action.

The Agreement terminated on March 22, 1993. On remand, a disputed question will be whether sellers breached the Agreement by violating Sections 4.1(a) (best efforts) and 4.1(c) (nondisclosure). Buyers' allegations supporting their unclean hands defense, including their assertions concerning Paul's discussions with Zeko and Luikart between February 4 and March 22, 1993, will be relevant to the claim that sellers breached the Agreement in failing to use best efforts.

## Declaratory Judgment for TSI

Buyers argue that TSI's declaratory judgment claim that the Agreement expired on March 22, 1993, was moot, because at the time of trial: (1) buyers had withdrawn their claim for specific performance, (2) sellers had withdrawn their claim that buyers were interfering with the sellers' efforts to negotiate a transaction with CVC after March 22, 1993, and (3) the declaratory relief sought did not concern TSI's fraud claims. We do not agree.

The standard of review on whether a declaratory judgment action rises to the level of an actual controversy is abuse of discretion.

See *Wichita Computer & Supply, Inc. v. Mulvane State Bank*, 15 Kan. App. 2d 258, 260-61, 805 P.2d 1255, *rev. denied* 248 Kan. 999 (1991).

Buyers also contend that declaratory judgment is not a proper mode of determining the sufficiency of legal defenses, citing 22A Am. Jur. 2d, Declaratory Judgments § 43. However, that authority says that "declaratory judgment is not a proper mode of determining the sufficiency of legal defenses to a *pending* action." (Emphasis added). Here, TSI's declaratory judgment claim was asserted in the petition initiating this lawsuit.

The pretrial order provided in part:

"5. Theory of Defendants Jenkins' and Hood's Defenses

"Plaintiff TSI seeks a declaratory judgment that the contract between it and Jenkins and Hood was no longer in existence on March 25, 1993. *Defendants Jenkins and Hood contend that the contract remained in force after TSI Holdings' purported termination of it on March 24, 1993*, that TSI Holdings cannot force a termination of the contract by failing to fulfill its obligations under the contract and that TSI Holdings breached its contract with Jenkins and Hood." (Emphasis added.)

While the parties dispute over the Agreement's expiration date remained unresolved, TSI's declaratory judgment claim was not moot. The trial court did not abuse its discretion in ruling on the declaratory judgment claim.

### Time of Essence

The buyers reason that because the Agreement did not provide that time was of the essence, the closing was continued beyond March 22, 1993. They rely on *Russell v. Ferrell*, 181 Kan. 259, Syl. ¶ 1, 311 P.2d 347 (1957) ("Time is not ordinarily regarded as of the essence of a contract unless it is so stipulated by express terms, or is necessarily implied from the character of the obligations assumed."). According to buyers, neither *Russell* condition is present in this case. They also contend that a reasonable time for performance of a contract is a question for the jury, citing *Rymph v. Derby Oil Co.*, 211 Kan. 414, 418, 507 P.2d 308 (1973).

The buyers marshal primarily real estate contract cases as support for their position. In *Russell*, a specific performance case, the real estate contract did not expressly make time of the essence, and

neither did the circumstances surrounding the sale. 181 Kan. at 266-67. See *Hochard v. Deiter*, 219 Kan. 738, 742, 549 P.2d 970 (1976) (The real estate contract did not specify a time limit within which sellers were to furnish merchantable title. In buyers' action for specific performance, we held a reasonable time was intended.); *Rymph*, 211 Kan. at 418 (After the well was completed, plaintiffs sought to repudiate an agreement to drill because of delays. We held the well was drilled in a reasonable time and said: "When time of performance is not fixed in an executory contract the usual rules of construction should be employed to ascertain the intention of the parties, and if the nature of the subject matter and the surrounding circumstances so indicate a reasonable time for performance shall apply."); *Federal Deposit Ins. Corp. v. Slinger*, 913 F.2d 7, 12-13 (1st Cir. 1990) (The vendor, who retained a $40,000 down payment, waived the "time is of the essence" clause in the contract by granting the purchaser's request for an open extension of time.); *Poggioli v. Liebegott*, 77 Misc. 2d 449, 453, 354 N.Y.S.2d 57 (1974) (The vendor, who had requested an extension prior to closing, was entitled to a reasonable extension of time for the closing of real estate contract after neither party appeared at closing.).

Jenkins and Hood point out that they tendered performance on the closing date, March 22, 1993. However, they knew that the Bank had not agreed to release the pledged TSI stock. There was no indication when the Bank might release the stock.

TSI responds that the Agreement expired on March 22, 1993, because Section 2.1 required that the parties mutually agree to extend the closing date, and no mutual agreement took place. TSI relies on *Morton v. Sutcliffe*, 175 Kan. 699, 266 P.2d 734 (1954). *Morton* involved cancellation of an oil and gas lease. The lease expressly provided that it would "cease to be of any force or effect" if the annual payment was not made before the year in question. The payment was made 6 days late. Judgment, affirmed on appeal, was entered for the lessor, canceling the lease. The Agreement in this case does not contain an automatic termination provision as explicit as the one in *Morton*. However, the parties did mutually agree to extend the closing date twice, first from February 26 to

March 15, 1993, and second from March 15 to March 22, 1993, but never beyond March 22, 1993.

Buyers next argue that Part IX(e) of the Agreement shows that only the buyers had a right to unilaterally terminate the Agreement after the closing date, if sellers were unable to perform as of the closing date. Part IX provides:

"This Agreement may be terminated at any time prior to the Closing Date:

(e) by Buyers at any time following February 26, 1993 in the event that Buyers are ready, willing, and able to fulfill Buyers' obligations hereunder and TSI, the Subsidiaries, Shareholders, Paul, or Hodes, have not fulfilled all of their obligations hereunder."

Buyers argue that if the Agreement expired on the closing date (March 22, 1993), Part IX(e) is rendered a nullity, contrary to the basic principles of contract construction. However, Part IX provided the buyers with the right to terminate before closing. Once the closing date was extended past February 26, 1993, the buyers' right to terminate under Part IX (e) would extend only up to the new closing date. Part IX (e) does not address the contingency that the February 26, 1993, closing date would be extended. If the words "closing date" had been inserted instead of "February 26, 1993," in Part IX(e), then that contingency would have been covered.

The rule that time is not ordinarily regarded as of the essence, absent an express stipulation or unless the nature or subject matter of the contract or circumstances indicate otherwise, is said to arise in equity. See 17A Am. Jur. 2d, Contracts § 483. This rule is especially true in a real estate contract case involving a purchaser seeking specific performance, after having made a down payment. See *Russell*, 181 Kan. 259, Syl. ¶ 1.

This case concerns the sale of a controlling interest in an operating business, not real estate. TSI was highly leveraged and needed an infusion of capital and new management. Buyers made no down payment and have withdrawn their claim for specific performance. The Agreement specified a closing date that could be changed only by mutual agreement. The parties negotiated two brief extensions of the closing date, but did not negotiate any ex-

tensions beyond March 22, 1993. The circumstances suggest that time was of the essence.

### Buyers' Claims Against CVC and Citibank

The district court granted CVC and Citibank's motion for summary judgment solely on the basis that sellers' performance under the Agreement was impracticable and commercially frustrated. Therefore, buyers argue, if the district court's rationale was erroneous, then summary judgment should not have been granted. We agree.

CVC and Citibank respond that the district court's determination was not erroneous, endorsing essentially the same arguments as sellers. In addition, they argue that summary judgment would have been proper on the alternative ground that CVC's and Citibank's conduct was not the proximate cause of the failure of the Agreement to close. Having resolved summary judgment based on impracticability of performance and commercial frustration, the district court did not address the proximate cause contention. Buyers acknowledge that to make a case of tortious interference with contract, they must prove that the acts of either CVC or Citicorp caused the breach. See *V.C. Video, Inc. v. National Video, Inc.*, 755 F. Supp. 962, 970-71 (D. Kan. 1990).

On summary judgment, the district court is required to resolve all facts and inferences which might reasonably be drawn from the evidence in favor of buyers. See *Fletcher v. Nelson*, 253 Kan. 389, 391, 855 P.2d 940 (1993) (rules relating to summary judgment reviewed).

At the hearing on CVC and Citibank's motion for summary judgment, the district judge, after finding that the Agreement as a matter of law could not be performed, said, in part:

"But for that finding [of impracticability of performance and commercial frustration], Jenkins and Hood would be entitled to a trial on the issue of the alleged tortious interference as between CitiBank and CitiCorp with TSI Holdings during the term of the agreement between TSI and Jenkins and Hood. So that the ruling is narrow, it's based upon the same finding in the trial court. If I'm in error as to that ruling, then I'm in error as to this ruling. But if I am correct—and I intend to be—if I'm consistent in anything, I want to be consistent in my error just as much as I want to be consistent in my findings as I've made them."

The district court granted the buyers' motion under K.S.A. 60-3703 to assert a claim against CVC and Citibank for punitive damages, applying the standard of *Fusaro v. First Family Mtg. Corp.*, 17 Kan. App. 2d 730, Syl. ¶ 3, 843 P.2d 737 (1992). Buyers argue that with this ruling, the district court implicitly held that a jury could reasonably find in their favor on the tortious interference claim.

The district judge's September 1994 ruling on the K.S.A. 60-3703 motion to assert punitive damages was based on the record developed before trial. We have recently reviewed K.S.A. 60-3703 punitive damages amendment issues. See *Fusaro v. First Family Mtg. Corp.*, 257 Kan. 794, 802, 897 P.2d 123 (1995).

If sellers breached the Agreement, CVC and Citibank may have induced the breach. Buyers claim they did not find out about the problem with the release of the pledged TSI stock until March 12, 1993, 2 days after the meeting with Zeko and Luikart at TSI. Paul may have preferred to deal with CVC, as opposed to buyers, because of CVC's and Citibank's greater financing resources and business connections.

The tortious interference issue is before us on summary judgment. The March 10, 1993, meeting of Luikart, Zeko, Paul, and other TSI personnel, and records of telephone calls between TSI and CVC or Citibank between March 10 and March 22, 1993, raise material issues of fact about whether CVC and Citibank tortiously interfered with sellers' performance of the Agreement.

## TSI Cross-Appeal Issues

The district court entered a directed verdict against TSI on its claims of fraudulent misrepresentation and fraud by silence against Jenkins and Hood. We affirm.

TSI bases its misrepresentation claims on the fact that during the 1992 negotiations, Hood represented that he had the financial capacity to make the required payments for the purchase—$1 million at closing and $1.5 million one year later. However, as of January 11, 1993, Hood was turned down for financing by three banks, and the fourth bank, Boatmen's Bank, would provide financing for the $1 million initial payment only if Hood obtained a guarantor.

Neither Hood nor Jenkins disclosed this to TSI. Paul claims that he and TSI would not have signed the Agreement had he known that Hood needed a guarantor to obtain financing.

Section 3.3(e) of the Agreement gave the sellers the right to request Hood's financial information; however, no request was made. Paul never attempted to examine Hood's financial condition.

Section 7.2(c) of the Agreement made satisfactory review of the financial capabilities of the buyers a condition precedent to TSI's obligations. TSI's chief financial officer testified that although Jenkins gave him a copy of Hood's financial statement, the TSI officer never looked at it.

The burden of proving fraud is by a preponderance of the evidence, which must be clear, convincing, and satisfactory. *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 226 Kan. 70, Syl. ¶ 7, 596 P.2d 816 (1979). (See PIK Civ. 2d 14.40 and PIK Civ. 2d 14.42 [1995 Supp.], cited by the parties, for the elements of the fraudulent misrepresentation and fraud by silence claims.)

TSI bases its fraud by silence claims on buyers' failure to inform TSI and Paul that Hood did not have the financial strength to complete the transaction without a guarantor. Buyers respond that neither TSI nor Paul asked Hood whether Hood had the financial capability to make the investment on his own. Hood obtained a commitment from Boatmen's Bank to lend the $1 million needed for the closing. Hood was ready, willing, and able to perform as of the closing date.

The evidence did not establish sufficient proof of any of the elements of either a fraudulent misrepresentation or a fraud by silence claim. Most telling is TSI's failure to request any financial information from Hood. The district court properly directed a verdict for Jenkins and Hood on TSI's fraud claims.

### Attorney Fees

The district court, interpreting the Agreement, awarded attorney fees and costs to TSI. The prevailing parties in a lawsuit are not entitled to recover attorney fees unless such fees are specifically authorized by statute or agreement. *Oak Park Investment Co. v. Lundy's Inc.*, 6 Kan. App. 2d 133, Syl. ¶ 1, 626 P.2d 1236 (1981).

Section 8.4 of the Agreement provides:

> **"Section 8.4. Costs.** If any legal action or other proceeding is brought by any party to this Agreement against any other party to this Agreement for the enforcement or interpretation of any of the rights or provisions of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and all other costs and expenses incurred in that action or proceeding, in addition to any other relief to which it may be entitled."

Our reversal based on buyers' breach of the Agreement claims also reverses the attorney fees and costs award.

Section 8.4 will be revisited by counsel and the district court after a final resolution of the substantive issues. We do address one aspect of the award to signal our reading of Section 8.4. TSI argues that its fraud claims on which buyers prevailed were not covered under Section 8.4 because they did not involve "the rights or provisions of this Agreement." TSI characterizes its fraud claims as involving acts or omissions by buyers occurring before the signing of the Agreement. However, Section 8.4 also covers actions or proceedings brought *"because of an alleged dispute . . . or misrepresentation in connection with any of the provisions of this Agreement."* Buyers successfully defended against the fraud claims, in part, by pointing to provisions in the Agreement that gave the sellers the right to request financial information. Thus, TSI's fraud claims against buyers are covered under Section 8.4 of the Agreement.

## CONCLUSION

We affirm the district court on:

(1) the directed verdict in favor of buyers on TSI's fraud claims; and

(2) the declaratory judgment ruling in favor of TSI that the Agreement terminated on March 22, 1993.

We reverse the district court on:

(1) the directed verdict against buyers on their breach of contract claims;

(2) the summary judgment in favor of CVC and Citibank on buyers' tortious interference with contract claim based on impracticability of performance; and

(3) the award of attorney fees and costs in favor of sellers.

Affirmed in part, reversed in part, and remanded.