ASSOCIATED COMMUNICATIONS & RESEARCH SERVICES, INC.; and ACRS Construction Company, Inc., Plaintiffs,

v.

KANSAS PERSONAL COMMUNICATIONS SERVICES, LTD., a/k/a KPCS, Ltd., a Kansas corporation; and Bertha Coffin, individually and as director of Kansas Personal Communications Services, Ltd., a/k/a KPCS, Ltd., a Kansas corporation, Defendants.

No. 97–1349–JTM.

United States District Court, D. Kansas.

July 7, 1998.

Derek S. Casey, Hutton & Hutton, Wichita, KS, David Youngblood, Moore, Mowdy & Youngblood, Atoka, OK, for Litigant Associated Communications & Research Services Inc., ACRS Construction Company, Inc.

William L. Mitchell, Hutchinson, KS, Donald Patterson, Sayler & Smith, Topeka, KS, for Kansas Personal Communications Services Ltd.

David G. Seely, Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, KS, for Floyd F.

Neyman, Derenda J. Mitchell, William L. Mitchell, Kenneth Cable, H.P. Dehoff.

Donald Patterson, Sayler & Smith, Topeka, KS, for Bertha Coffin.

## MEMORANDUM ORDER

MARTEN, District Judge.

The present case arises from an attempt to create a Personal Communications System (PCS) in Kansas. The owner of a PCS license for certain areas in Kansas, Kansas Personal Communications Services, Ltd. (KPCS), contracted with two Oklahoma corporations, Associated Communications & Research Services, Inc. (ACRS) and ACRS Construction Company, for the design and construction of the system. KPCS did not acquire the funding necessary to complete the project, and the Oklahoma corporations have instituted the present action against KPCS for breach of contract and fraud. The plaintiffs have also sought recovery against numerous directors and officers of KPCS. By an earlier order, the court granted the motion to dismiss advanced by the individual directors other than KPCS President Bertha Coffin.

Two motions are currently before the court. In the first, the plaintiffs seek summary judgment in the amount of $155,984.58. Although not explicitly stated in the three-page brief supplied by plaintiffs who style their motion as a motion for summary judgment rather than a motion for partial summary judgment, the plaintiffs' motion appears solely to address the breach of contract claim. The other motion before the court is the motion for summary judgment of Bertha Coffin, which seeks dismissal of all claims advanced against her as an individual. The court finds the Coffin motion must be granted, the plaintiffs' motion denied.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital,* 854 F.2d 365,

367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.,* 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir.1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The plaintiffs assert in their motion for summary judgment that they completed 11.8 miles of construction of fiber optic cable as one part of the project, and, citing defendant's answer to one of their interrogatories, that the construction was satisfactory. The defendant's response, however, presents a host of defenses to the contract claim which remain viable in light of the evidence before the court. The defendant KPCS acknowledges the cable was properly installed, but argues the contract excuses the need for payment in the event of default. KPCS con-

tends the plaintiffs defaulted on the contract by failing to pay subcontractors and failing to provide certification of insurance as required under the contract. KPCS argues that the damage figures provided by the plaintiffs are controverted based on whether they were performed either not within the time required by the contract or after the time KPCS gave notice of its inability to raise financing. Finally, KPCS also argues the present action is barred by KSA 17–7307 since the plaintiffs have not been authorized to do business in Kansas and have not paid any Kansas taxes.

K.S.A. 17–7307 provides:

A foreign corporation which is required to comply with the provisions of K.S.A. 17–7301 and 17–7302 and which has done business in this state without authority shall not maintain any action or special proceeding in this state, unless and until such corporation has been authorized to do business in this state and has paid to the state all taxes, fees and penalties which would have been due for the years or parts thereof during which it did business in this state without authority. This prohibition shall not apply to any successor in interest of any such foreign corporations.

The court finds plaintiffs' motion for summary judgment should be denied. The defenses raised by KPCS remain to be viable, and the court cannot say in light of the evidence before it that ACRS's contract claim to the specified damages is clearly established as a factual matter beyond a reasonable doubt. Not insignificantly, the plaintiffs have not filed any reply to KPCS's response which would demonstrate the asserted defenses are invalid.

The briefing is much more significant on Coffin's summary judgment motion. Still, even though plaintiffs provide at least some response to Coffin's motion, the response rendered is unacceptable. Plaintiffs' brief does little to comply with the rules governing such pleadings. First, plaintiffs make no attempt to comply with D.Kan.Rule 83.5.4(c), which requires signature of local counsel. Moreover, the response makes no attempt whatsoever to controvert the facts advanced by Coffin. The response offers additional facts, not in numbered paragraphs as required, but in the context of a general narra-

tive. Further, the substantive facts claimed in the narrative are frequently unsupported by relevant, admissible evidence.

The following facts are uncontroverted.

Plaintiffs Associated Communications & Research Services, Inc. (ACRS) and ACRS Construction Company, Inc. are Oklahoma corporations headquartered in Oklahoma City. ACRS Construction is wholly owed by ACRS, which performs all the engineering work. Clayburn Curtis is the president of ACRS and a member of its board of directors. Samuel T. Curtis, his son, is the chief executive officer of ACRS Construction, but Clayburn Curtis was and is also authorized to speak on behalf of the subsidiary.

ACRS's services include engineering, design, and inspection for construction, but does not perform actual construction. According to Curtis, it also provides cost accounting services, traffic studies in connection with accounting, financial analysis, capital asset model comparisons, and appraisals of telecommunications property based on multiples of cash flow. ACRS investigates and provides access to known financial institutions, but it does not provide any funding itself. Curtis knows that telephone systems are built with loans or capital, and he helps prepare documents to aid in securing loans. Curtis also knew that customers present ACRS-prepared business plans to lenders to help secure financing. ACRS Construction mainly performs construction work.

Curtis was awarded a bachelor's degree from Central State University in Edmond, Oklahoma in 1966, majoring in mathematics and minoring in physics. He has no engineering degree, and took no courses in telephone communications. He is a member of the Institute of Electronic Engineers.

Defendant Kansas Personal Communications Services (KPCS) is a Kansas corporation. Defendant Bertha Coffin is the President and General Manager of KPCS. In addition, since the death of her husband, Coffin has also been the managing officer of Council Grove Telephone Company.

Curtis met Coffin at a business meeting in Dallas, Texas, where he was making a pre-

sentation on personal communication services (PCS) technology. Coffin told Curtis she was involved with cellular phones in Kansas, and was interested in getting involved in PCS. Curtis told her that although PCS could use either analog or digital systems, the PCS of the future would mainly use digital technology. Curtis has admitted, however, that prior to his contract with KPCS, neither he nor his companies had ever installed such a system. Curtis's first experience with a PCS system was with KPCS.

Curtis knew Coffin was acting in her capacity as president of KPCS, and not in any personal capacity. She signed all documents as an officer of the company. Curtis dealt with Coffin only as president of KPCS and its chief operating officer.

ACRS prepared a business plan before the first PCS frequency auction by the FCC which began in December, 1995. It was paid $1,500 for the plan, with the knowledge the plan would be used to borrow money. The plan, which included projected equipment and installation, would also be used to provide an upper limit for the highest bid. Curtis estimated a negative cash flow for two years after the system was designed and construction started, all of which would have to be paid through capital, stock offerings, and borrowed funds.

Under the FCC's auction procedure, frequencies are sold for a specific geographical area. In this context, to "implement a license" means to design and build an operating system to use the license granted by the FCC. Curtis handled the bidding on behalf of KPCS, and was paid fees of $22,132.64 for his services. At the time of the bidding, Curtis knew KPCS had no source of income. He knew that some of some of KPCS's equity had been provided by his own stock purchases. He also knew that Coffin was selling stock at that time in order to raise funds to pay for the license filing fees and current expenses.

Curtis told KPCS that, in the first two years following the beginning of construction, the company would have a negative cash flow, with estimated expenses in the first year of $2 million. He knew KPCS did not have assets on hand to meet these obligations, and that meeting them through stock sales or borrowing was uncertain of success.

By May 3, 1996, Curtis owned 1, 500 shares of KPCS, and had attended a stockholders' meeting. At the meeting, Coffin announced that five percent of the total bid cost had to be paid within five working days of the auction's close, and another five percent in the next three to six months. Coffin told the meeting that there would be a shortfall of funds, but that she would try to make it up. Curtis knew that, without additional stock sales or loans, KPCS could not meet its existing payment obligations.

By July 11, Curtis had bought an additional 1,500 shares, having paid a total of $30,000 for his interest in the company. Curtis intended to buy a two or three percent interest in KPCS, and that he would charge the same for construction whether or not he was a stockholder. He made no inquiry about the finances and capital of the company, expecting that Coffin was committed to the project. Curtis knew that until operating income exceeded costs, KPCS's only source of funds was sales of stock or borrowing. He also knew no one could guarantee successful borrowing or the amount to be gained through stock sales.

At a meeting in July, Curtis reported to KPCS on the licenses he obtained for the company in the FCC bidding. He had successfully bid three trade areas, or BTAs—areas centered on Topeka, Emporia, and Hutchinson, Kansas. As a part of its bid, KPCS was obligated to pay $9,698,251.00 for its licenses.

The three BTAs acquired were given numbers 445, 129, and 200, respectively. Under the plan created by ACRS, three phases of construction would be undertaken, beginning in the Topeka area.

Curtis did not see KPCS's May, 1996 balance sheet until stockholders' meeting in May of 1997. However, its content did not alarm him, because he knew of the loan obligation, and the need for stock sales and borrowing.

In July of 1996, Curtis sent Coffin a Memorandum of Intent and a Construction Con-

tract. Curtis signed the agreements on July 15, Coffin on July 24. The Memorandum of Intent obliges ACRS, KPCS, and the directors and stockholders of KPCS to use their best efforts to obtain construction funding. In his transmittal letter accompanying the agreements, Curtis wrote that KPCS would be billed for services as they were rendered, "but we will not expect payment until your first phase of construction is funded." (Def.Exh.18). At the time of the agreement, Curtis knew that the initial capitalization of KPCS of $400,000 had already been spent.

Curtis attended a September 9, 1996 KPCS Board of Directors meeting, reporting only a possible "group purchase," under which he would join several major companies to purchase equipment in bulk.

By the January of 1997, the parties entered into a construction contract for the construction of the 11.8 miles of fiber optic cable along Highway 56. This agreement was signed by Coffin in her capacity as KPCS President and by Sam Curtis as President of ACRS Construction. According to Coffin, in performing the contract she dealt only with Clayburn Curtis and that Curtis oversaw the construction work for ACRS in Kansas.

The agreement also required ACRS Construction to furnish a list of unpaid suppliers and subcontractors. ACRS furnished such a list. According to KPCS, the list showed an amount due from ACRS Construction of $164,023.28. The contract also required ACRS Construction to furnish a certification of insurance, but the certificate furnished by the company showed the policy had been canceled January 7, 1997—prior to the construction contract.

By the end of 1996, KPCS had made all payments due. As of March 17, 1997, all amounts due under the contract had been paid.

In March of 1997, the plaintiffs offered a discount on invoices to improve KPCS's cash flow. According to Coffin, she told plaintiffs that KPCS was running out of money. She told Curtis that the proposed discount was contrary to their agreement, and that KPCS could not make payments because of lack of funds. Curtis denies Coffin made such state-

ments. Curtis does admit that the amounts charged by plaintiffs were not actually due until "Phase I" was funded, and that he merely "assumed" the project was funded.

On March 12, 1997, an ACRS agent named Lightfoot wrote to KPCS, recommending and seeking permission for the purchase of 77.5 miles of fiber optic cable. This cable was proposed for use between Topeka and Wichita, even though this was outside the scope of the parties' written agreements. According to Coffin, she told Curtis any agreement to use the cable could be paid in increments only as it was needed, and in any event would require ACRS obtaining right-of-way approval from the Kansas Turnpike Authority. According to Curtis, he was not told of this condition, but Curtis has admitted that a right-of-way agreement was necessary, and that the plaintiffs never obtained such an agreement. An alternative right-of-way agreement with the Kansas Department of Transportation was never explored.

The plaintiffs purchased the cable and charged the defendants for it. At some point, ACRS charged for $62,000 in returned cable. Coffin denied the charge on the ground the cable should never have been purchased in the first place. Curtis eventually agreed with Coffin.

In April of 1997, Curtis wrote to Coffin agreeing to give credit for $315,000 reflecting the cost of the cable and transportation and handling. Coffin denies actually receiving this credit. There is also a dispute between the parties as to whether ACRS, in an agreement with KPCS as to a credit owing for work performed for Council Grove Telephone, such credit was properly paid.

Curtis attended a May 2, 1997 meeting of the board which approved expenses for construction in the area of the Kansas Turnpike, subject to finalization of a contract with the Kansas Turnpike Authority, and subject to obtaining financing. Curtis did not make any objection, and knew that KPCS had very little in the way of funds. At this time, Curtis was slowing down construction, and was only doing clean-up work.

Curtis knew raising the necessary capital was uncertain. Curtis states in his deposi-

tion that Coffin had asked him about both sources for borrowing and suggestions on other sources for funds, and that they had contacted RFTC Bank and Bank One, and had discussed vendor financing. Curtis has stated he has no reason to believe Coffin did not use her best effort to raise money from, stock sales, borrowing, or both. No one ever told Curtis that Phase I of the construction project had been funded.

In May of 1997, Curtis wrote a letter to Coffin which reflects that he knew of KPCS's cash flow problem, and that the same situation had existed since the previous May.

In April of 1997, Coffin told ACRS and ACRS Construction to stop work because of a lack of funds. She continued attempts to raise money, making stock sales through May, 1997. One of the ACRS companies made a suggestion of a potential source of funding as late as June 24, 1997. Coffin pursued the suggestion, but was unable to obtain any funds.

The defendants paid $431,622.14 to the plaintiffs in connection with their agreements. From the beginning of 1996 until June 24, 1997, the defendants engaged in a continuous effort to obtain funds for construction.

All of the construction work was done in Kansas. However, neither ACRS nor ACRS Construction has been authorized to do business in Kansas by the Kansas Secretary of State, nor had it been authorized to do so by the Society of Professional Engineers until after the present litigation was commenced. Neither ACRS nor ACRS Construction paid any sales tax, unemployment tax, or Kansas withholding tax for the work done in Kansas, on the stated grounds that all the workers were hired from Oklahoma.

### Conclusions of Law

■ As indicated earlier, the court finds that summary judgment should be granted. The first thing that should be noted is that the contract claim against Coffin is effectively abandoned by plaintiffs. Much of Coffin's motion dealt with establishing that she dealt with plaintiffs only in her representative capacity on behalf of KPCS, that the plaintiffs were aware of her status, and that as a result she is not responsible for any contractual debts of the company. The response by

ACRS and ACRS Construction wholly ignores Coffin's argument, and addresses only the claim of fraud by Coffin.

■ The court finds there are also grounds for dismissing the claim of fraud. The facts provided by Coffin establish that the contract obligation of KPCS was not to provide funding for the construction, but for the company and its officers to use their best efforts to secure funding. Coffin conceded in his deposition that there is no evidence the defendants did not use their best efforts.

Coffin has also admitted he knew funding for the project was uncertain, but stresses in the response that Coffin told him that he should not worry about the funding, and that she would "make arrangements for payment." (Plf.Exh. G, at 2). Taken in context, however, this last comment, which is taken from minutes of the May 3, 1996 stockholders' meeting, clearly means that Coffin would continue to try to secure funding. Curtis himself conceded in his deposition that funding depended on additional stock sales or borrowing, and that no one could guarantee either would be successful.

The plaintiffs also rely on affidavits submitted by Clayburn and Sam Curtis to the effect that specific representations were made that Coffin had obtained funding for the construction project. Thus, Clayburn Curtis avers that on March 27, 1997, Coffin told him that "there were sufficient funds to pay for our services." (Plf.Exh. C, at ¶ 7). The problem with these recent averments is that they fly in the face of earlier deposition admissions. Clayburn Curtis testified in his deposition that he knew KPCS's funding was contingent on successful stock sales and borrowing, and that "nobody ever told [me] otherwise." (Curtis dep. at 94). Curtis expressly states in his deposition that he did not have any discussion with Coffin about the availability of funds from March 17 to May 22, 1997 (Id. at 121). The response makes no attempt to explain the contradiction between the affidavit and the earlier deposition testimony. The affidavit should be excluded as an attempt to create a sham fact issue to avoid summary judgment. *See Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986).

Further, even if the representations had been made, the plaintiffs have failed to demonstrate the statements were false. It appears from the evidence that KPCS did have funds to pay for work completed by plaintiffs in a timely manner and with authorization. It is uncontroverted that the purchase of $260,587.80 of fiber cable from Sprint on March 13, 1997 was unauthorized, since no prior right-of-way agreement had been obtained. KPCS was obliged under the contract only to pay sums when they became due. In its uncontroverted facts, unresponded to by plaintiffs, the obligation to pay was specifically made contingent on the funding of "Phase I," which was never funded.

The breach of a contract does not itself constitute fraud. *All West Pet Supply Co. v. Hill's Pet Products*, 840 F.Supp. 1426, 1432 (D.Kan.1993). Here, there is no evidence Coffin did not intend to keep the promise to attempt to obtain funding. *Wayman v. Amoco Oil*, 923 F.Supp. 1322, 1344 (D.Kan. 1996). Curtis never attempted to obtain specific information about KPCS's financing. Given Curtis's clear knowledge of the uncertainty of funding, the plaintiffs' fraud claim, whether couched as active misrepresentation or fraud by silence, cannot stand upon the general statements by Coffin that she was attempting to obtain funding. *See T.S.I. Holdings v. Jenkins*, 260 Kan. 703, 727, 924 P.2d 1239 (1996).

IT IS ACCORDINGLY ORDERED this 7th day of July, 1998, that the defendant Coffin's motion for summary judgment (Dkt.No.61) is hereby granted; the motion for summary judgment of plaintiffs (Dkt.No.59) is denied.