[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-14773
_____

D.C. Docket No. 3:10-cv-00222-MCR

DZ BANK AG DEUTCHE ZENTRAL-GENOSSENSCHAFTSBANK, a.k.a. DZ
Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt AM Main, New York
Branch, a.k.a. DZ Bank AG Deutsche Zentral-Genossensschaftsbank, Frankfurt
AM Main, a.k.a. DZ BK AG Deutsche Zentra NY BR, a.k.a. DZ Bank AG, a.k.a.
DZ Bank,

Plaintiff-Appellee,

versus

MICHAEL MCCRANIE, a.k.a. Michael J. McCrainie,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(January 10, 2018)

Before MARTIN, JILL PRYOR, and MELLOY,[*] Circuit Judges.

MELLOY, Circuit Judge:

In this breach-of-contract action, the district court conducted a bench trial and concluded a written contract ("the Note") was a negotiable instrument, Plaintiff-Creditor DZ Bank AG Deutche Zentral-Genossenschaftsbank ("DZ Bank") was a holder in due course, and this status alone defeated Defendant-Debtor Michael McCranie's defenses to enforcement of the Note.  The district court held in the alternative that, even if McCranie could assert his defenses, he failed to prove them.  The district court then determined McCranie defaulted on the Note and was liable for damages.  McCranie appeals.  We conclude the Note is not a negotiable instrument but was properly transferred to DZ Bank.  Moreover, we conclude McCranie's defenses fail and the Note is enforceable.  Accordingly, we affirm the judgment of the district court.[1]

## I. Background

### A. Introduction

Because the parties tried this case without a jury, we present the facts in the light most favorable to the district court's findings and verdict.  See Tartell v. S.

---

[*] Honorable Michael J. Melloy, United States Circuit Judge for the Eighth Circuit, sitting by designation.

[1] McCranie asserts no arguments on appeal to challenge the finding that he breached the Note or to challenge the computation of damages, interest, or fees.

2

Fla. Sinus & Allergy Ctr., Inc., 790 F.3d 1253, 1257 (11th Cir. 2015) ("After a bench trial, we review the district court's conclusions of law *de novo* and the district court's factual findings for clear error.").  In general, this case involves a dizzying number of contracts related to the purchase of an insurance agency, the resale of that agency as a franchise, loans and security agreements related to the franchisee's purchase of the agency, loans from outside lenders to the franchisor, and grants of security interests to these outside lenders (loans and security agreements to which the franchisee was not a party, but for which the franchisee's loan was pledged as collateral).  Although the parties' various arguments are technical in nature, their basic positions are simple.  Defendant-Debtor McCranie argues the underlying contracts were part of one integrated agreement under which his obligation to pay the Note was conditioned upon the success of the franchise endeavor and the absence of a breach by any of the parties to the various contracts.  Plaintiff-Creditor DZ Bank argues the Note itself is a stand-alone instrument enforceable without reference to the success or failure of the franchise endeavor and without reference to the breach of other agreements.  DZ Bank argues in the alternative that, even if we could view the separate contracts as one integrated agreement, none of the writings grant to McCranie the right he asserts—the right to avoid performance under the Note.

Ultimately, we conclude DZ Bank has the better argument. While McCranie's situation is unfortunate, he entered into the franchise and lending relationships as a sophisticated actor with the assistance of counsel knowing that his loan might be sold. The eventual breach of the franchise agreement by a party to that agreement, and the commercial failure of the franchise endeavor, were foreseeable events. DZ Bank's predecessor in interest on the Note secured for itself protection against such events. McCranie did not. He entered into the Note without conditioning his obligations on the absence of such a breach or on the success of the franchise. Simply put, his obligation to pay the Note is independent from and not excused by these other failures.

## B. History

Brooke Corporation ("Brooke") was in the business of buying existing insurance agencies and selling them as franchises to agents who financed their purchases through a separate Brooke-related entity: Brooke Credit Corporation ("Brooke Credit"). McCranie purchased a Brooke agency franchise in Florida in October 2000. He entered into two agreements with Brooke: a Franchise Agreement and an Agreement for Sale of Agency Assets. At the same time, he entered into four agreements with Brooke Credit: a large promissory note to fund the purchase of agency assets, a smaller promissory note to fund initial operating expenses, a Security Agreement, and an Agreement for Advancement of Loan

4

("Advancement Agreement").    McCranie, an experienced insurance agent who previously had bought and sold "many independent [insurance] agencies," was represented by counsel during negotiation and execution of these agreements.

The Advancement Agreement defined a term, "Loan Documents," as "[t]his Agreement and all other agreements, instruments and documents, . . . now and/or from time to time hereafter executed by and/or on behalf of Borrower [McCranie] and delivered to Lender [Brooke Credit] in connection therewith." The Advancement Agreement expressly referenced the large promissory note and the Security Agreement, and provided several protections for Brook Credit, allowing Brooke Credit to declare McCranie in default and accelerate sums due upon the occurrence of any of several different events.  Examples of such events included: McCranie's failure to meet certain sales quotas under his Franchise Agreement with Brooke; McCranie's breach or failure to perform under any Loan Documents; and McCranie's death or insolvency.    The Advancement Agreement did not contain parallel protections for McCranie.  It did not grant McCranie parallel rights in the event of another party's breach of the Franchise Agreement or insolvency. The Advancement Agreement imposed upon McCranie certain additional duties above and beyond performance under the Loan Documents such as financial reporting requirements.  Finally, through the Advancement Agreement, McCranie "grant[ed], convey[ed] and assign[ed] to [Brooke Credit] as additional security all

5

the right, title and interest in and to [McCranie's] Agency Assets, including without limitation, [McCranie's] rights, title and interest in and to the Agent Agreement, Subagent Agreements, Agent's Account and Customer Accounts . . . ," reserving the right to "collect, receive, enjoy and use the Agency Assets so long as [McCranie] is not in default under the terms of any of the Loan Documents." All parties appear to agree that the "Agency Assets" that mattered—the assets that held value in the eyes of the parties—were the contractual rights with the underlying insurers and the existing and future commissions related to those relationships.

Pursuant to the Agreement for Sale of Agency Assets, McCranie purchased agency assets from Brooke, and pursuant to the Security Agreement, he immediately pledged those assets to Brooke Credit as collateral to secure the two October 2000 promissory notes. Through the Franchise Agreement, Brooke served as "agent of record" in the underlying contracts with the underwriting insurers for whom McCranie sold policies. As agent of record, Brooke was the owner of all sales commissions. Pursuant to the Franchise Agreement, Brooke was to receive the commissions from McCranie's sales of policies and was then to pay 85% of those commissions to McCranie (or apply them to McCranie's outstanding loan from Brooke Credit). In addition, Brooke was to serve as a back office for McCranie's franchise operations. Finally, McCranie could unilaterally terminate the Franchise Agreement upon 30 days' notice. Upon termination of the Franchise

6

Agreement, Brooke was to "request the pertinent [insurance] Companies . . . to make the Franchise Agent [McCranie] the Agent of Record for all Customer Accounts."[2]

In 2002, McCranie entered into another promissory note, Loan No. 2752, with Brooke Credit in the amount of $831,407.78 to refinance his earlier loans. Loan No. 2752 is the Note at issue in this appeal. On its face, the Note contains text in a box indicating, "This note is separately secured by . . . Security Agreement dated October 30, 2000." Apart from this boxed text, in a different section, the Note states, "ADDITIONAL TERMS: See Agreement for Advancement of Loan dated October 30, 2000." The Note on its face does not

---

[2] Paragraph 6.5 of the Franchise Agreement also apportioned responsibility for securing replacement coverage for agency clients in the event of non-transfer of agent-of-record status. Paragraph 6.5 provided, in full:

> Upon termination of this Agreement, Brooke shall request the pertinent Companies involved to make the Franchise Agent the Agent of Record for all Customer Accounts. In the event that a Company refuses to make the Franchise Agent the Agent of Record for Customer Accounts, then Franchise Agent shall, on or before the next Policy term expiration date following termination of this Agreement, obtain replacement coverages for said Customer Accounts with another Company. Brooke shall continue to account for and process Customer Accounts until the Policy term expiration date following termination of this Agreement. Although Brooke shall not be obligated to assist Franchise Agent in obtaining replacement coverages for Customer Accounts, Brooke shall provide to Franchise Agent the Policy term expiration data and Customer Account data available through Brooke's Document Manager system. If the Franchise Agent does not obtain replacement coverages for Customer Accounts on or before the policy term expiration date following termination of this Agreement, then Brooke shall obtain coverages for said Customer Accounts and Franchise Agent thereby relinquishes to Brooke all ownership of, possession of, or other right to or interest in said Customer Accounts and any related files.

indicate what subject matter the additional terms address or otherwise indicate how they affect the parties' rights and obligations.

McCranie operated his Brooke franchise for approximately eight years, from 2000 to 2008, receiving payments from Brooke for commissions that McCranie generated and Brooke received as agent of record. McCranie paid on the original two promissory notes for two years and on the Note for approximately six years. By mid-2008, he had reduced the principal balance on the Note to under $500,000.

Meanwhile, in 2004, Brooke Credit entered into a series of contracts with several entities, including another Brooke-related entity, Brooke Credit Funding ("Brooke Funding"). Brooke Funding was a vehicle for obtaining funding from outside sources, and McCranie was not a party to the contracts between Brooke Credit and Brooke Funding. In August 2004, Brooke Credit and Brooke Funding entered into a Sale and Servicing Agreement with Brooke Credit as seller and Brooke Funding as purchaser of various loans owned by Brooke Credit. Pursuant to the Sale and Servicing Agreement, eligible loans included loans Brooke Credit entered into after August 2004. That same day, these two parties along with DZ Bank and Brooke, entered into a Credit and Security Agreement through which the current plaintiff, DZ Bank[3], ultimately agreed to extend a line of credit to Brooke

---

[3] DZ Bank actually served as an agent for a separate entity, but for purposes of the present appeal, we refer herein to these parties as DZ Bank.

8

Funding and take a security interest in the loans Brooke Funding was purchasing from Brooke Credit.  Under this Credit and Security Agreement, Brooke Credit was the seller and servicer of the loans, Brooke Funding was the purchaser, Brooke served as the Master Agent and as a guarantor, and DZ Bank served as the lender. DZ Bank filed Uniform Commercial Code ("U.C.C.") financing statements in Delaware and Kansas as to Brooke Funding and Brooke Credit on August 27, 2004.

Four days later, however, Brooke Credit entered into a "Participation Certificate and Agreement" with a different entity: Home Federal Savings and Loan ("Home Federal") purporting to sell to Home Federal a 99.74% interest in the Note.  Pursuant to this agreement, Brooke Credit was the originating lender and Home Federal was a participating lender.  Home Federal did not search U.C.C. filings for prior claims on the Note nor did Home Federal file any U.C.C. statements regarding its purported rights to the Note.  Then, two years later in August 2006, Brooke Credit, Brooke Funding, Brooke, and DZ Bank entered into updated versions of their 2004 agreements: an Amended and Restated Sale and Servicing Agreement, and an Amended and Restated Credit and Security Agreement.

Eventually DZ Bank advanced to Brooke Funding tens of millions of dollars in several separate tranches.  In February 2008, DZ Bank advanced a tranche of

9

$3,901,457 to Brooke Funding pursuant to the 2006 Amended Credit and Security Agreement.  Of those funds, $416,947.14 were expressly designated for Brooke Funding's purchase of the Note from Brooke Credit.  Although the Note was identified in connection with this tranche of funding, and although the 2004 and 2006 agreements identified loans for sale to Brooke Funding as loans originated after 2004, the Note itself had been executed in 2002.  Notwithstanding the apparently non-qualifying nature of the Note under the 2004 and 2006 agreements, these agreements contained provisions acknowledging the fact that loans other than those described might be sold.  These provisions permitted, but did not require, the parties to the 2004 and 2006 agreements to object to the inclusion or transfer of non-qualifying loans.  In the event of an objection, these parties could demand that Brooke Credit substitute a qualifying loan or repurchase the non-qualifying loan. Neither Brooke Funding nor DZ Bank objected to the inclusion of the Note in the February 2008 tranche of funding.  Neither party sought to force the repurchase of the Note or request substitution with a different loan as permitted by the agreements.

Throughout this time, Brooke's business was not thriving, and relationships between lenders, insurers, franchisor, and franchisees broke down.  On June 19, 2008, DZ Bank terminated its line of credit with Brooke Funding.  In June, July, and August 2008, Brooke failed to forward commission payments to McCranie. On

10

September 3, 2008, McCranie demanded payment, notified Brooke that he could not meet his obligations to Brooke Credit without commissions from Brooke, and notified Brooke that he was terminating the Franchise Agreement. In doing so, he expressly demanded that Brooke take steps to have insurers transfer "agent of record" status to him so he could continue to sell policies for the insurers associated with the franchise. According to McCranie, Brooke's failure to pay commissions served as a material breach of the Franchise Agreement. Also according to McCranie, he was not at that point in default under the Franchise Agreement with Brooke or the Advancement Agreement or Note with Brooke Credit, and, as such, he was entitled to continue using Agency Assets. McCranie also sent notice to Brooke Credit because, according to McCranie, (1) Brooke Credit had to authorize the transfer of "agent of record" status, and (2) the Advancement Agreement with Brooke Credit authorized McCranie's use of Agency Assets—assets McCranie needed to operate his franchise. Neither Brooke nor Brooke Credit took steps to make McCranie agent of record with the underlying insurers. Then, throughout September and October 2008, many insurers pulled their business from Brooke franchises such as McCranie's agency.

In mid-October 2008, McCranie received a notice from DZ Bank dated October 1, indicating DZ Bank was aware of McCranie's notice of termination. DZ Bank instructed McCranie to make future loan payments to DZ Bank rather

11

than to Brooke Credit, citing the transfers through which Brooke Funding pledged the Note to DZ Bank. McCranie, however, had not previously dealt with Brooke Funding or DZ Bank. Further, the notice included no documentation of DZ Bank's asserted ownership of the Note. Also in October 2008, McCranie received a similar but competing demand for payment from Home Federal. Home Federal attached the August 31, 2004 Agreement purporting to transfer a 99.74% interest in the Note from Brooke Credit to Home Federal.

Then, on October 14, McCranie received a second letter from DZ Bank stating:

> In connection with [the Note], we are enclosing a letter from Brooke Capital Corporation, Brooke Agency Services Company, LLC and Brooke Investments, Inc. (collectively, "Brooke"), pursuant to which Brooke has agreed to the termination of your franchise agreement, effective upon DZ Bank's consent to such termination. We are pleased to inform you that we are prepared to grant such consent following our receipt of an executed acknowledgement from you in the form attached hereto . . . .
>
> Once we have received the original executed Acknowledgment, we will work with you to arrange for you to become the Agent of Record for insurance policies purchased from, serviced, renewed or delivered through you. As part of that process, you will need to contact the insurance carriers directly to obtain an agency appointment. Once you have obtained an appointment, please contact us to let us know the producer code and we will work with you and the relevant carriers to complete the transition. If you are not able [] to obtain an appointment, we will, upon your request, do what we can to assist you in establishing a relationship with a master general agent so that you can continue in business.

12

> Please note that DZ Bank has obtained a power of attorney from Brooke authorizing DZ Bank to take actions to facilitate your appointment as Agent of Record. In addition, we may be able to assist you in locating contact persons at the insurance carriers to facilitate your appointment and/or in locating a master general agent with whom you can establish a relationship. If you believe we can be of assistance in this process, or have any additional questions regarding the matters described in this letter, please contact any of the following individuals . . . .

Brooke Capital Corporation, Brooke Agency Services Company, LLC, and Brooke Investments, Inc., were not the parties McCranie had contracted with in 2000 and 2002. DZ Bank included with this letter an acknowledgement for McCranie to execute and return. McCranie did not execute the acknowledgement, instead returning it with a note indicating he did not have enough information to assess the situation. McCranie does not allege he took any action to call upon DZ Bank for assistance in preserving relationships with insurers.

In October 2008, Brooke filed for bankruptcy. On October 30, DZ Bank, Brooke Credit, and Brook Funding entered into an agreement to perfect the transfer of ownership of collateral (including the Note) to DZ Bank: a Surrender of Collateral, Consent to Strict Foreclosure, Release and Acknowledgement Agreement. And on October 31, DZ Bank and Brooke Funding entered into an Omnibus Assignment Agreement, further confirming DZ Bank's ownership of

13

Brooke Funding's rights as Brooke Credit's assignee.  At that time, Brooke Funding owed DZ Bank approximately $35 million.

On March 11, 2010, DZ Bank filed the present action claiming McCranie was liable to DZ Bank on the Note for an outstanding balance of "$484,425.42 plus attorney's fees, costs and interest."  The district court granted summary judgment in DZ Bank's favor.  On appeal to our court, we held a triable question of fact precluded summary judgment because DZ Bank's "chain of title [was] anything but overwhelming," and other evidence suggested the Note had been sold, instead, to Home Federal Savings and Loan.  DZ Bank v. McCranie, 513 F. App'x 911, 914 (11th Cir. 2013).  On remand, at the bench trial, DZ Bank provided further evidence of title to the Note, and the district court ruled in DZ Bank's favor, entering judgment against McCranie.

## II. Discussion

McCranie's arguments on appeal, while technical in nature, are simple at heart.  He argues generally that Brooke's breach of the Franchise Agreement excuses his breach of the Note.  To advance this argument he asserts a general theory that all (or most) of the underlying contracts in this case were part of one overall integrated agreement governing the franchise endeavor such that his obligation to honor the Note rests upon the viability of the endeavor and the absence of a breach of the Franchise Agreement by Brooke.  In pressing this

14

theory, he argues strenuously that the Note is not a negotiable instrument and that DZ Bank is not a holder in due course because, if the Note is a negotiable instrument and DZ Bank is a holder in due course, most of his arguments are barred by statute. See Kan. Stat. Ann. § 84-3-305 (listing the limited defenses available to a debtor as against the holder in due course of a negotiable instrument). He then presents several specific arguments in an attempt to defeat enforceability of the Note. The parties agree Kansas law applies. We address McCranie's several arguments in turn.

## A.  Negotiable Instrument

Pursuant to the U.C.C., as adopted in Kansas, "'negotiable instrument' means an unconditional promise . . . to pay a fixed amount of money, with or without interest . . . to bearer or to order   . . . [that] does not state any other undertaking or instruction by the person promising . . . payment." Kan. Stat. Ann. § 84-3-104(a). Although this definition appears rigid, certain conditions and additional promises or undertakings are permitted without defeating negotiability: those that relate to security interests, prepayment rights, or duties surrounding the preservation of collateral. See id. § 84-3-104(a)(3) ("[T]he promise . . . may contain (i) an undertaking or power to give, maintain, or protect collateral to secure payment, [or] (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral . . . .").

15

A hallmark of negotiability, however, is the self-contained nature of the instrument and the ability to determine the entirety of the parties' rights and duties without consulting additional writings.  See 6 William D. Hawkland & Larry Lawrence, Uniform Commercial Code Series § 3-106:2 (rev. supp. 2016) ("An instrument does not freely circulate in commerce if a purchaser must examine a separate agreement to determine whether payment of the instrument is conditioned upon the performance of some act or event. . . .  The mere existence of the requirement that another writing be consulted is sufficient to destroy negotiability; it is irrelevant that examination of the other writing does not reveal a condition precedent to payment.").  In general, a *mere reference* to a separate document does not preclude a note from being deemed a negotiable instrument.  See A.I. Trade Fin., Inc. v. Laminaciones de Lesaca, S.A., 41 F.3d 830, 836 (2d Cir. 1994) ("[A] note containing an otherwise unconditional promise is not made conditional merely because it refers to, or states that it arises from, a separate agreement or transaction."); see also Williams v. Regency Fin. Corp., 309 F.3d 1045, 1049 (8th Cir. 2002) ("[W]here there is a paucity of [controlling] case law interpreting a provision of the U.C.C., . . . courts . . . look for guidance to decisions of other jurisdictions . . . ."); Black v. Don Schmid Motor, Inc., 657 P.2d 517, 523–24 (Kan. 1983) (looking to other jurisdictions).  Mere references provide context for

16

the commercial transactions giving rise to the instrument and do not, on their face, suggest the promise to pay is subject to additional terms, conditions, or promises.

In contrast, a "disqualifying" reference is one that indicates a need to examine a separate document to determine the parties' rights and duties, *i.e.*, one that indicates the promise to pay is "subject to" or "governed by" the other writing. Kan. Stat. Ann. § 84-3-106(a) ("[A] promise or order is unconditional unless it states . . . (2) that the promise or order is subject to or governed by another writing."). Even a reference indicating a need to consult a separate writing, however, will not defeat negotiability if the reference makes clear that the terms in the separate writing relate to a grant or preservation of collateral or to prepayment or acceleration. These exceptions are express on the face of § 84-3-106(b)(1), and they relate simply to the permissible undertakings and promises pursuant to § 84-3-104(a)(3).

The distinction between when a note's reference to another writing does or does not defeat negotiability, therefore, rests on two factors: the completeness and clarity of the note itself in setting forth the parties' obligations and the clarity and completeness of the reference. This is true regardless of whether the separate writing actually amends the material terms of the parties' agreement. It is the need to consult the other writing that makes the note incomplete on its face and defeats negotiability. The applicable official U.C.C. comment makes this clear:

17

[A] promissory note is not [a negotiable] instrument . . . if it contains any of the following statements: 1. "This note is subject to a contract of sale dated . . . between the payee and maker of this note." 2. "This note is subject to a loan and security agreement dated . . . between the payee and maker of this note." 3. "Rights and obligations of the parties with respect to this note are stated in an agreement dated . . . between the payee and maker of this note." *It is not relevant whether any condition to payment is or is not stated in the writing to which reference is made. The rationale is that the holder of a negotiable instrument should not be required to examine another document to determine rights with respect to payment.* But subsection (b)(i) permits reference to a separate writing for information with respect to collateral, prepayment, or acceleration.

For example, a note would not be made conditional by the following statement: "This note is secured by a security interest in collateral described in a security agreement dated . . . between the payee and maker of this note. Rights and obligations with respect to the collateral are [stated in][governed by] the security agreement." The bracketed words are alternatives, either of which complies.

U.C.C. § 3-106, cmt. (emphasis added).

Here, McCranie argues the Note's reference to the Advancement Agreement which states, "ADDITIONAL TERMS: See Agreement for Advancement of Loan dated October 30, 2000," defeats negotiability because this reference indicates not merely the existence of a separate agreement, but the existence of unidentified "additional terms." According to McCranie the phrase "additional terms" necessarily describes contractual terms that govern the parties' relationship under the Note, unambiguously informing a reader of the Note that the Note is not wholly self-contained. DZ Bank counters that the Advancement Agreement creates no

18

additional rights for DZ Bank and imposes no additional duties on McCranie other than rights and duties that are permissible under Kansas Statutes §§ 84-3-104 and 106, namely, rights and duties concerning the grant of security interests, the preservation of collateral, and the right of the lender to declare default and demand accelerated payment in the event of default.  In the alternative, DZ Bank asserts the quoted reference is a mere reference indicating the existence of a separate agreement.

Given the Advancement Agreement's myriad protections for Brooke Credit and obligations for McCranie, we have serious doubts as to DZ Bank's assertion that the Advancement Agreement contains only permissible undertakings. Regardless, the actual contents of the Advancement Agreement do not matter for our analysis of this issue.  The reference in the Note, in and of itself, defeats negotiability.  The Note does not merely recite the existence of the Advancement Agreement, but instead, indicates that the Advancement Agreement contains "additional terms."  This reference is akin to a disqualifying statement that the Note is "subject to" or "governed" by the separate writing.  Kan. Stat. Ann. § 84-3-106(a)(2).  Further, nothing about the reference to the Advancement Agreement, as expressed in the Note, suggests that these additional terms relate solely to the permissible subjects of granting or preserving collateral or spelling out acceleration or prepayment rights.  Simply put, no party examining the Note can know with any

19

reasonable assurance what the subject matter of the "additional terms" might be without obtaining and consulting the Advancement Agreement.

Further, and importantly, the reference to the Advancement Agreement is additional to and wholly apart from the Note's separate reference to the Security Agreement. The Note, several lines below the reference to the Advancement Agreement, employs a box to set off text from the balance of the document and draw attention to the statement, "SECURITY: This note is separately secured by (describe separate document by type and date): Security Agreement dated October 30, 2000." This identification of a second separate writing as governing the parties' security arrangement—a different writing separate and apart from the referenced Advancement Agreement—most naturally suggests that the additional terms in the Advancement Agreement relate to something *other than* a security interest. At a minimum, the inclusion of this separate reference does nothing to clarify that the Advancement Agreement might contain only permissible undertakings pursuant to § 84-3-106(b)(1).

DZ Bank's arguments concerning the actual contents of the Advance Agreement, therefore, are misplaced. Given the inability to determine from the face of the Note that the "additional terms" might relate solely to permissible

topics under § 84-3-106(b)(1), the Note is not negotiable.[4]  Because we conclude

the Note is not a negotiable instrument, we need not address whether DZ Bank is a

"holder in due course" as that term is a term of art under the UCC.

## B.  DZ Bank's Standing to Enforce the Note

The fact that the Note is not a negotiable instrument does not mean the Note

is unenforceable or non-transferable.  At trial, McCranie contested broadly the

adequacy of DZ Bank's proof of its chain of title to the Note.  The district court

determined DZ Bank adequately established that Brooke Credit sold the Note to

Brooke Funding, Brook Funding pledged the Note to DZ Bank as collateral, and

---

[4] DZ Bank, as a substantial lender to Brooke Funding, has been involved in litigation with several parties throughout the country in situations similar to the present dispute.  In briefing to our court, DZ Bank cites opinions from such cases, stating, "Several other district courts have considered identical promissory notes under Kansas law and granted judgments in favor of DZ Bank, none of which concluded that the note was non-negotiable." Several of the cited cases involved acknowledgements by the borrower that DZ Bank had standing to enforce the note, and in some cases the borrower had actually entered into forbearance agreements with DZ Bank prior to litigation.  In none of the cited cases did any court hold an underlying note between a franchise agency borrower and a Brooke entity qualified as a negotiable instrument. *See, e.g.*, *DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt AM Main v. Choice Cash Advance, LLC*, 918 F. Supp. 2d 1156 (W.D. Wash. 2013) (finding a borrower liable on a similar note after the borrower acknowledged DZ Bank's status as creditor and defaulted on the note), *aff'd*, 608 F. App'x 497 (9th Cir. 2015) (affirming the denial of a motion to reconsider); *DZ Bank AG Deutsche Zentral-Genossenschaftsbank v. All Gen. Lines Ins., LLC*, No. 10-2126-CM, 2013 WL 1151277 (D. Kan. Mar. 20, 2013) (granting summary judgment in favor of DZ Bank without reference to Article 3), *confirming on reconsideration,* No. 10-2126-CM, 2013 WL 3869947 (D. Kan. July 26, 2013) (confirming on reconsideration the grant of summary judgment); *DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt AM Main, N.Y. Branch v. McCauley*, No. 2:10-00008-RWS, 2010 WL 3943735 (N.D. Ga. Oct. 6, 2010) (entering summary judgment against the debtor without reference to Article 3 and finding allegations of fraud against various Brooke entities "irrelevant" to the question of liability towards DZ Bank as the assignee).  In short, these cases do nothing to bolster DZ Bank's argument that the Note in the present case is a negotiable instrument.  And we find it telling that the parties cite no cases in which a court actually held a contract similar or identical to the Note qualified as a negotiable instrument.  That having been said, consistent with the result we reach herein, the courts in all of these cited cases actually determined that DZ Bank held enforceable rights.

21

DZ Bank foreclosed upon and took possession of the Note, receiving a full assignment of the Note.

On appeal, McCranie does not present arguments renewing all of his challenges to this series of transactions.  Rather, McCranie makes a single, focused legal argument based upon the August 27, 2004 Sale and Servicing Agreement and the August 29, 2006 Amended and Restated Sale and Servicing Agreement.  Specifically, McCranie argues these agreements applied only to loans Brooke Credit entered into after 2004 whereas the Note was executed in 2002.  According to McCranie, this discrepancy shows the Note could not have been included in the bundle of notes sold by Brooke Credit to Brooke Funding and eventually pledged and transferred to DZ Bank.

McCranie was not a party to the August 29, 2006 Amended and Restated Sale and Servicing Agreement (or to the corresponding 2004 agreement it updated).  As such, he may not challenge the sale of the Note based upon the Note's supposed ineligibility under that agreement.  These agreements gave Brooke Funding and DZ Bank, and no unlisted parties, the right to accept or reject certain loans that might otherwise be deemed ineligible for transfer and the right to demand substitution or repurchase of objected-to loans.  These agreements, therefore, anticipated the possibility that ineligible loans might be transferred, creating for the parties substitution and repurchase rights.  It follows from the

22

permissive rather than mandatory nature of these rights of rejection that the underlying agreement envisioned the transfer of otherwise ineligible loans.

Because DZ Bank established the transfer of the Note and no party to the 2006 Amended and Restated Sale and Servicing Agreement contested the transfer, we conclude DZ Bank properly obtained the Note. Any attempt by McCranie to invoke protections of the 2006 agreement fall short, as that agreement expressly precludes the creation of rights in a third party beneficiary. The 2006 agreement, in Section 8.6, states:

> Nothing in the Agreement, express or implied, shall give to any Person, other than the parties hereto, the Agent [Brooke] and the Secured Parties [DZ Bank] and their successors hereunder and permitted assigns, any benefit or legal or equitable right, remedy or claim under this Agreement.

The Note on its face was transferable and payable to Brooke Credit "or its order." Brooke Credit and Brooke Funding, in fact, transferred the Note and treated it as being subject to the August 29, 2006 Amended and Restated Sale and Servicing Agreement. McCranie, therefore, as a stranger to that agreement, cannot enforce its terms or challenge the transfer based on non-compliance with that agreement. See Noller v. GMC Truck and Coach Div., Gen. Motors Corp., 772 P.2d 271, 275 (Kan. 1989) ("Contracting parties are presumed to act for themselves and therefore an intent to benefit a third person must be clearly

23

expressed in the contract. . . . The intention of the parties is to be determined from the instrument itself where the terms are plain and unambiguous." (internal citations omitted)). Not only did the contract fail to list McCranie as an intended third-party beneficiary, its terms expressly excluded that possibility. See State ex rel. Stovall v. Reliance Ins. Co., 107 P.3d 1219, 1232 (Kan. 2005) ("Performance of a contract will often benefit a third person. But unless the third person is an intended beneficiary as here defined, no duty to him is created." (quoting Restatement (Second) of Contracts § 302, cmt. e (1979))). The district court did not err in its legal determination that McCranie was not permitted to invoke the 2004 or 2006 agreements to defeat the transfer.

## C. Defenses—Sale of Goods

Citing provisions from U.C.C. Article 2, McCranie argues that his contracts with Brooke and Brooke Credit were one integrated agreement for the purchase of goods. According to McCranie, he never received the contracted-for "goods" because, upon entering into the asset-purchase agreement, he was required to transfer all title to the agency assets to Brooke Credit as security for his loans. McCranie concludes that, because he did not receive "the goods," he is excused of the obligation to continue making payments.

McCranie's attempt to invoke Article 2 fails because he does not identify what he purchased that might qualify as "goods." He makes reference to agency

assets as a whole (which presumably include real property and personal property in addition to the underlying rights arising from contractual relationships with the insurers such as the rights to existing and future commissions).  McCranie makes no attempt to explain how these varied assets including intangible property and ancillary contractual rights, might satisfy the definition of "goods" set forth in Kansas Statutes § 84-2-105(1) & (2).

Even assuming some individual assets among the agency assets might qualify as goods, however, the Franchise Agreement and Sale of Agency Assets (viewed collectively as urged by McCranie) would be, at most, a mixed contract for the sale of "goods" and services.  In this regard, Kansas long ago adopted the "predominant purpose" test for assessing when a contract for a mixture of goods and services might qualify as a contract for the sale of goods pursuant to Article 2. See Golden v. Den–Mat Corp., 276 P.3d 773, 791 (Kan. Ct. App. 2012) (quoting Care Display, Inc. v. Didde–Glaser, Inc., 589 P.2d 599, 605 (Kan. 1979)).  Here, the predominant purpose for the Franchise Agreement and Sale of Agency Assets quite clearly was to establish the franchise relationship as a joint service endeavor between Brooke and McCranie.  To the extent McCranie attempts to invoke any protections of Article 2, we reject his arguments.[5]

---

[5] At trial, when discussing his prior experience in the purchase and sale of independent insurance agencies, McCranie summarized such transactions as follows, effectively clarifying that a purchase of an agency franchise is not a contract for the sale of goods:

25

### D.  Defenses—One Integrated Agreement and Doctrines of Commercial Frustration and Impossibility of Performance

The context and purposes for the original promissory notes, and later, the Note, were to fund the initial purchase and operation, and subsequent refinancing, of the franchise agency.  Brooke Credit, as the lender, secured for itself myriad protections to permit itself to monitor McCranie's performance under the Franchise Agreement between McCranie and Brooke, and to declare default and accelerate the Note upon the occurrence of any number of events.  McCranie did not negotiate or obtain reciprocal protections in the Note or the Advancement Agreement.

---

> Well, in the insurance business, the value is the revenue that the company is paying you for the contracts – the policies that you place with them. . . .  But it's important to understand that it is extremely—especially back then—difficult to get any bank to finance these agencies, because they were based on the service contract, and those service contracts with each individual carrier is—simply, can be cancelled at any time.  Those contracts required the insurance agent to, you know, be in—compliant with all the laws, all the laws; be in complian[ce] with having an office open to the public, all those issues, and be—of the utmost, not have any kind of fraudulent dealings or anything.  They also can be cancelled at any time.
>
> So I'm just getting to the point, they're very fragile contracts.  And that in itself—there's a lot of talk about—we say collateral, we say assets, we say asset securitization.  All those words are used, but the bottom line is, *what you're purchasing when you buy an insurance agent, is you're purchasing the right to be the owner of that service contract with a third-party insurance company.*  That is your—that's your title.

(Emphasis added)

26

McCranie did obtain the right to demand that Brooke ask the underlying insurers to transfer "agent of record" status to him upon his own termination of the Franchise Agreement.  McCranie did not, however, secure for himself a guarantee that such a transfer would occur, a set of remedies to invoke in the event of non-transfer, or an "escape valve" for his obligations on the Note in the event such a transfer did not take place.  As such, we must reject McCranie's theory that all of the contracts between himself and Brooke or Brooke Credit comprise "one integrated agreement" under which one breach might excuse another.  Whether viewed individually or collectively, nothing in the agreements McCranie cites grant to him a right to avoid performance under the Note with Brooke Credit based upon Brooke's non-performance under the Franchise Agreement.

Turning to McCranie's more specific theories of defense, Kansas has recognized and discussed the doctrines of commercial frustration of purpose and impossibility (or impracticability) of performance.  See T.S.J. Holdings v. Jenkins, 924 P.2d 1239, 1247–49 (Kan. 1996) (collecting cases); see also Columbian Nat'l Title Ins. v. Twp. Title Serv., 659 F. Supp. 796, 802–04 (D. Kan. 1987) (discussing differences between impossibility or impracticability of performance and commercial frustration).  These doctrines, however, are not a panacea for ill-fated business relationships.  And they are inapplicable where the reasons for the frustration of purpose or impracticability of performance were foreseeable at the

27

time of contract formation. See Winfrey v. Galena Auto. Co., 214 P. 781, 782 (Kan. 1923) ("[The party] was liable for the breach of the contract, although contingencies or circumstances arose which made it difficult or even beyond its power to perform—circumstances which might have been provided against when the contract was made."); Sunflower Elec. Coop., Inc. v. Tomlinson Oil Co., 638 P.2d 963, 971–72 (Kan. Ct. App. 1981) (doctrine inapplicable where oil producer could have, but failed to, foresee an oil field's inability to meet the contract's needs); Wichita Props. v. Lanterman, 633 P.2d 1154, 1161 (Kan. App. Ct. 1981) ("[T]he defense of impossibility is only available where the performance is rendered impossible by the happening of an unanticipated event which could not be foreseen or guarded against in the contract." (quoting Ogdensburg Urban Renewal Agency v. Moroney, 345 N.Y.S.2d 169, 171 (N.Y. App. Div. 1973))).

Here, McCranie argues his inability to perform under the Note is due to Brooke's breach of the Franchise Agreement and the resulting termination of relationships by the agency's underwriting insurers. This failure and these terminations, however, were not only foreseeable risks, they were *foreseen* by Brooke Credit and McCranie. The Advancement Agreement provided Brooke Credit protection against these contingencies, including the right to declare McCranie in default of the Advance Agreement upon McCranie's failure to perform under the Agreement to Purchase Agency Assets (Advancement

28

Agreement paragraph 13(b)(i)), his failure to perform under the Franchise Agreement (Advancement Agreement paragraph 13(b)(ii)), or his "default . . . in performing the obligations and duties of any contract relating to Borrower's [McCranie's] business . . ." (Advancement Agreement paragraph 13(d)).

McCranie admits that, at the time he entered into the agreements in 2000, he was experienced in purchasing and selling insurance agencies. Further, the Franchise Agreement (to which Brooke Credit itself was not a party) demonstrates that Brooke and McCranie recognized the critical importance of maintaining relationships with the underwriting insurers and protecting against lapses in performance by the "agent of record" with those companies.[6] The Franchise Agreement granted McCranie the right to terminate the agreement on 30-days'

---

[6] Again, McCranie's own trial testimony largely defeats his own legal arguments. At trial, when discussing the sale of insurance agencies, McCranie stated:

> Well, you would never purchase an agency without terms and contingencies. When I say that, just to use an example, if you're going to sell me an agency and I had cash to give you, you have to place an order with the third party, which would be the insurance company, to transfer those agency contracts to me. So I can hand you $50,000, but if we don't stipulate the agreement and the conditions, I may not get one company to agree to transfer the agent of record. If that happens, I have nothing for my money.

> So it'd be very rare, if ever, that the purchase would happen with no agreement, just money. I just – you know, because the companies are going to decide whether they're going to contract with that person that you're selling to. And ask me about my experience, I sold eight to ten agencies that I had operated and ran for quite a while, and every one of those agencies, I had to sell and do the financing. And it's a very risky financing, because I transferred the agent of record to the individuals, and if they quit paying me, I would have a real hard time getting my hands on any collateral, because it's up to the companies to recontract—there's nothing that I can retake.

notice and imposed on Brooke a duty to "request the pertinent Companies involved to make [McCranie] the Agent of Record for all Customer Accounts." Maintenance of relationships with the insurers was not a matter of trivial importance to McCranie, Brooke, or Brooke Credit.  And yet, McCranie entered into the Note and Advancement Agreement without securing reciprocal protections that would excuse his performance under the Note in the event the Brooke's failures damaged relationships with insurers.  Moreover, McCranie entered into the Advancement Agreement and Note knowing that Brooke Credit might sell the Note and that some unknown future party (possibly a stranger to Brooke) might be his creditor if and when the agency failed.[7]

Finally, McCranie was not only experienced in the sale and purchase of insurance agencies, he was represented by counsel.  Execution of the Advancement Agreement and the Note required him to provide letters from counsel describing examination of the Loan Documents and opining as to their enforceability and as to the absence of various misrepresentations.  He provided such a letter in 2000 and again in 2002.  If McCranie believed at the time of contracting that his obligation to pay on the Note was dependent upon the success of the agency, such a belief needed to be expressed in the writings. Simply put, if one sophisticated and well-

---

[7] Paragraph 18 of the Advancement Agreement granted Brooke Credit the right to assign the Note without McCranie's consent and precluded McCranie from assigning his interests in any Loan Documents.  And paragraph 10(b) imposed upon McCranie duties to assist Brooke Credit to "sell, convey, or market . . . the Loan Documents to any Person."

counseled party to a contract secures for itself protections against particular contingencies, the occurrence of such contingencies to the detriment of another party cannot later be deemed unforeseen. If Brooke Credit could anticipate and guard against a failure by McCranie under the Franchise Agreement, McCranie could anticipate and guard against a failure by Brooke. The defenses of impossibility (impracticability) of performance and frustration of purpose are unavailable in this case.

## E. Defenses—Impairment of Collateral and Duty of Good Faith and Fair Dealing

In related arguments, McCranie argues he is excused from paying on the Note because Brooke, Brooke Credit, or DZ Bank impaired the value of the collateral by failing to take steps necessary to preserve agency assets—to preserve the relationships with the underlying insurers and agency's right to sell policies. He also argues these failures amount to breaches of a duty of good faith and fair dealing and excuse his liability on the Note. McCranie cites no authority to support the assertion that a collateral impairment or breach-of-good-faith defense can find application when the alleged impairment: (1) relates to the failure to preserve contractual relationships with third parties independent of the creditor; and (2) the debtor himself would be a necessary participant in the efforts to maintain those relationships.

31

Because the note was properly transferred and McCranie's defenses fail, we affirm the judgment of the district court.

**AFFIRMED.**